TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MELISSA MILLS (Cal. Bar No. 248529)
J. JAMARI BUXTON (Cal. Bar No. pending)
SUSAN S. HAR (Cal. Bar No. 301924)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone:  (213) 894-0627
    Facsimile:  (213) 894-7631
    E-mail:    Melissa.Mills@usdoj.gov
               Jamari.Buxton@usdoj.gov
               Susan.Har@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**F I L E D**
CLERK, U.S. DISTRICT COURT

12/6/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VM _____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

            Plaintiff,

            v.

DAVID H. WRIGHT,

            Defendant.

No. CR  2:21-CR-00559-PA

PLEA AGREEMENT FOR DEFENDANT
DAVID H. WRIGHT

      1.    This constitutes the plea agreement between defendant DAVID
H. WRIGHT ("defendant") and the United States Attorney's Office for
the Central District of California (the "USAO") in the above-
captioned case.  This agreement is limited to the USAO and cannot
bind any other federal, state, local, or foreign prosecuting,
enforcement, administrative, or regulatory authorities.

                    DEFENDANT'S OBLIGATIONS

      2.    Defendant agrees to:

1          a.   At the earliest opportunity requested by the USAO and

2 provided by the Court, appear and plead guilty the single-count

3 information in the form attached to this agreement as Exhibit A or a

4 substantially similar form, which charges defendant with federal

5 program bribery in violation of 18 U.S.C. § 666(a)(1)(B).

6          b.   Not contest facts agreed to in this agreement.

7          c.   Abide by all agreements regarding sentencing contained

8 in this agreement.

9          d.   Appear for all court appearances, surrender as ordered

10 for service of sentence, obey all conditions of any bond, and obey

11 any other ongoing court order in this matter.

12          e.   Not commit any crime; however, offenses that would be

13 excluded for sentencing purposes under United States Sentencing

14 Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not

15 within the scope of this agreement.

16          f.   Be truthful at all times with the United States

17 Probation and Pretrial Services Office and the Court.

18          g.   Pay the applicable special assessment at or before the

19 time of sentencing unless defendant has demonstrated a lack of

20 ability to pay such assessments.

21          h.   Give up the right to indictment by a grand jury.

22                    THE USAO'S OBLIGATIONS

23   3.   The USAO agrees to:

24          a.   Not contest facts agreed to in this agreement.

25          b.   Abide by all agreements regarding sentencing contained

26 in this agreement.

27          c.   Except for criminal tax violations (including

28 conspiracy to commit such violations chargeable under 18 U.S.C.

§ 371), not further criminally prosecute defendant for honest
services wire and mail fraud in violation of 18 U.S.C. §§ 1341, 1343,
and 1346, conspiracy in violation of 18 U.S.C. § 371, destruction of
evidence in violation of 18 U.S.C. § 1519, false statements in
violation of 18 U.S.C. § 1001, or other violations of 18 U.S.C.
§ 666(a)(1)(B) arising out of defendant's conduct described in the
agreed-to factual basis set forth in Attachment A.  Defendant
understands that the USAO is free to criminally prosecute defendant
for any other unlawful past conduct or any unlawful conduct that
occurs after the date of this agreement.  Defendant agrees that at
the time of sentencing the Court may consider the uncharged conduct
in determining the applicable Sentencing Guidelines range, the
propriety and extent of any departure from that range, and the
sentence to be imposed after consideration of the Sentencing
Guidelines and all other relevant factors under 18 U.S.C. § 3553(a).

        d.   At the time of sentencing, provided that defendant
demonstrates an acceptance of responsibility for the offense up to
and including the time of sentencing, recommend a two-level reduction
in the applicable Sentencing Guidelines offense level, pursuant to
U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an
additional one-level reduction if available under that section.

                        NATURE OF THE OFFENSE

    4.   Defendant understands that for defendant to be guilty of
the crime charged in the single-count information, that is, federal
program bribery in violation of Title 18, United States Code, Section
666(a)(1)(B), the following must be true:

        a.   The defendant was an agent of LADWP;

1          b.    The defendant corruptly solicited or demanded for the
2    benefit of any person anything of any value;

3          c.    The defendant intended to be influenced or rewarded in
4    connection with any business, transaction, or series of transactions
5    of LADWP involving anything of value of $5,000 or more; and

6          d.    LADWP received, in any one-year period, benefits in
7    excess of $10,000 under a Federal program involving a grant,
8    contract, subsidy, loan, guarantee, insurance, or any other form of
9    Federal assistance.

10                              <u>PENALTIES</u>

11        5.    Defendant understands that the statutory maximum sentence
12   that the Court can impose for a violation of Title 18, United States
13   Code, Section 666, is: 10 years' imprisonment; a three-year period of
14   supervised release; a fine of $250,000 or twice the gross gain or
15   gross loss resulting from the offense, whichever is greatest; and a
16   mandatory special assessment of $100.

17        6.    Defendant understands that supervised release is a period
18   of time following imprisonment during which defendant will be subject
19   to various restrictions and requirements.  Defendant understands that
20   if defendant violates one or more of the conditions of any supervised
21   release imposed, defendant may be returned to prison for all or part
22   of the term of supervised release authorized by statute for the
23   offense that resulted in the term of supervised release, which could
24   result in defendant serving a total term of imprisonment greater than
25   the statutory maximum stated above.

26        7.    Defendant understands that, by pleading guilty, defendant
27   may be giving up valuable government benefits and valuable civic
28   rights, such as the right to vote, the right to possess a firearm,

                                    4

the right to hold office, and the right to serve on a jury. Defendant
understands that he is pleading guilty to a felony and that it is a
federal crime for a convicted felon to possess a firearm or
ammunition.  Defendant understands that the conviction in this case
may also subject defendant to various other collateral consequences,
including but not limited to revocation of probation, parole, or
supervised release in another case and suspension or revocation of a
professional license.  Defendant understands that unanticipated
collateral consequences will not serve as grounds to withdraw
defendant's guilty plea.

    8.   Defendant understands that, if defendant is not a United
States citizen, the felony conviction in this case may subject
defendant to: removal, also known as deportation, which may, under
some circumstances, be mandatory; denial of citizenship; and denial
of admission to the United States in the future.  The Court cannot,
and defendant's attorney also may not be able to, advise defendant
fully regarding the immigration consequences of the felony conviction
in this case.  Defendant understands that unexpected immigration
consequences will not serve as grounds to withdraw defendant's guilty
plea.

FACTUAL BASIS

    9.   Defendant admits that defendant is, in fact, guilty of the
offense to which defendant is agreeing to plead guilty.  Defendant
and the USAO agree to the statement of facts provided in Attachment A
hereto and agree that this statement of facts is sufficient to
support a plea of guilty to the charge described in this agreement
and to establish the Sentencing Guidelines factors set forth in
paragraph 11 below but is not meant to be a complete recitation of

1  all facts relevant to the underlying criminal conduct or all facts
2  known to either party that relate to that conduct.

3                          SENTENCING FACTORS

4       10.  Defendant understands that in determining defendant's
5  sentence the Court is required to calculate the applicable Sentencing
6  Guidelines range and to consider that range, possible departures
7  under the Sentencing Guidelines, and the other sentencing factors set
8  forth in 18 U.S.C. § 3553(a).  Defendant understands that the
9  Sentencing Guidelines are advisory only, that defendant cannot have
10  any expectation of receiving a sentence within the calculated
11  Sentencing Guidelines range, and that after considering the
12  Sentencing Guidelines and the other § 3553(a) factors, the Court will
13  be free to exercise its discretion to impose any sentence it finds
14  appropriate up to the maximum set by statute for the crime of
15  conviction.

16       11.  Defendant and the USAO agree to the following applicable
17  Sentencing Guidelines factors:

18      Base Offense Level:              14      [U.S.S.G. § 2C1.1(a)(1)]

19      Value of bribe between
        $1,500,001-$3,500,000           +16     [U.S.S.G. § 2B1.1(b)(1)(I)]
20
        Involved public official in     +4      [U.S.S.G. § 2C1.1(b)(3)]
21      high-level decision-making
        and sensitive position
22
        Obstruction of justice          +2             [U.S.S.G. § 3C1.1]
23

24  Defendant and the USAO reserve the right to argue that additional
25  specific offense characteristics, adjustments, and departures under
26  the Sentencing Guidelines are appropriate.

27       12.  Defendant understands that there is no agreement as to
28  defendant's criminal history or criminal history category.

                                  6

1     13.   Defendant and the USAO reserve the right to argue for a
2  sentence outside the sentencing range established by the Sentencing
3  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),
4  (a)(2), (a)(3), (a)(6), and (a)(7).

5                    WAIVER OF CONSTITUTIONAL RIGHTS

6     14.   Defendant understands that by pleading guilty, defendant
7  gives up the following rights:

8               a.   The right to persist in a plea of not guilty.

9               b.   The right to a speedy and public trial by jury.

10              c.   The right to be represented by counsel -- and if
11  necessary have the Court appoint counsel -- at trial.  Defendant
12  understands, however, that, defendant retains the right to be
13  represented by counsel -- and if necessary have the Court appoint
14  counsel -- at every other stage of the proceeding.

15              d.   The right to be presumed innocent and to have the
16  burden of proof placed on the government to prove defendant guilty
17  beyond a reasonable doubt.

18              e.   The right to confront and cross-examine witnesses
19  against defendant.

20              f.   The right to testify and to present evidence in
21  opposition to the charges, including the right to compel the
22  attendance of witnesses to testify.

23              g.   The right not to be compelled to testify, and, if
24  defendant chose not to testify or present evidence, to have that
25  choice not be used against defendant.

26              h.   Any and all rights to pursue any affirmative defenses,
27  Fourth Amendment or Fifth Amendment claims, and other pretrial
28  motions that have been filed or could be filed.

                                  7

WAIVER OF RETURN OF DIGITAL DATA

15.   Understanding that the government has in its possession digital devices and/or digital media seized from defendant, defendant waives any right to the return of digital data contained on those digital devices and/or digital media and agrees that if any of these digital devices and/or digital media are returned to defendant, the government may delete all digital data from those digital devices and/or digital media before they are returned to defendant.

WAIVER OF APPEAL OF CONVICTION

16.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE AND COLLATERAL ATTACK

17.   Defendant agrees that, provided the Court imposes a total term of imprisonment on all counts of conviction of no more than the statutory maximum of ten years, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the term

of probation or supervised release imposed by the Court, provided it
is within the statutory maximum; and (f) any of the following
conditions of probation or supervised release imposed by the Court:
the conditions set forth in Second Amended General Order 20-04 of
this Court; the drug testing conditions mandated by 18 U.S.C.
§§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions
authorized by 18 U.S.C. § 3563(b)(7).

18. The USAO agrees that, provided all portions of the sentence
are at the statutory maximum of ten years specified above, the USAO
gives up its right to appeal any portion of the sentence.

## RESULT OF WITHDRAWAL OF GUILTY PLEA

19. Defendant agrees that if, after entering a guilty plea
pursuant to this agreement, defendant seeks to withdraw and succeeds
in withdrawing defendant's guilty plea on any basis other than a
claim and finding that entry into this plea agreement was
involuntary, then (a) the USAO will be relieved of all of its
obligations under this agreement; and (b) should the USAO choose to
pursue any charge that was either dismissed or not filed as a result
of this agreement, then (i) any applicable statute of limitations
will be tolled between the date of defendant's signing of this
agreement and the filing commencing any such action; and
(ii) defendant waives and gives up all defenses based on the statute
of limitations, any claim of pre-indictment delay, or any speedy
trial claim with respect to any such action, except to the extent
that such defenses existed as of the date of defendant's signing this
agreement.

1                RESULT OF VACATUR, REVERSAL OR SET-ASIDE

2      20.  Defendant agrees that if the count of conviction is

3 vacated, reversed, or set aside, both the USAO and defendant will be

4 released from all their obligations under this agreement.

5                  EFFECTIVE DATE OF AGREEMENT

6      21.  This agreement is effective upon signature and execution of

7 all required certifications by defendant, defendant's counsel, and an

8 Assistant United States Attorney.

9                  BREACH OF AGREEMENT

10     22.  Defendant agrees that if defendant, at any time after the

11 signature of this agreement and execution of all required

12 certifications by defendant, defendant's counsel, and an Assistant

13 United States Attorney, knowingly violates or fails to perform any of

14 defendant's obligations under this agreement ("a breach"), the USAO

15 may declare this agreement breached.  All of defendant's obligations

16 are material, a single breach of this agreement is sufficient for the

17 USAO to declare a breach, and defendant shall not be deemed to have

18 cured a breach without the express agreement of the USAO in writing.

19 If the USAO declares this agreement breached, and the Court finds

20 such a breach to have occurred, then: (a) if defendant has previously

21 entered a guilty plea pursuant to this agreement, defendant will not

22 be able to withdraw the guilty plea, and (b) the USAO will be

23 relieved of all its obligations under this agreement.

24     23.  Following the Court's finding of a knowing breach of this

25 agreement by defendant, should the USAO choose to pursue any charge

26 that was either dismissed or not filed as a result of this agreement,

27 then:

28

1         a.    Defendant agrees that any applicable statute of

2   limitations is tolled between the date of defendant's signing of this

3   agreement and the filing commencing any such action.

4         b.    Defendant waives and gives up all defenses based on

5   the statute of limitations, any claim of pre-indictment delay, or any

6   speedy trial claim with respect to any such action, except to the

7   extent that such defenses existed as of the date of defendant's

8   signing this agreement.

9         c.    Defendant agrees that: (i) any statements made by

10  defendant, under oath, at the guilty plea hearing (if such a hearing

11  occurred prior to the breach); (ii) the agreed to factual basis

12  statement in this agreement; and (iii) any evidence derived from such

13  statements, shall be admissible against defendant in any such action

14  against defendant, and defendant waives and gives up any claim under

15  the United States Constitution, any statute, Rule 410 of the Federal

16  Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

17  Procedure, or any other federal rule, that the statements or any

18  evidence derived from the statements should be suppressed or are

19  inadmissible.

20        COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES

21                    OFFICE NOT PARTIES

22    24.  Defendant understands that the Court and the United States

23  Probation and Pretrial Services Office are not parties to this

24  agreement and need not accept any of the USAO's sentencing

25  recommendations or the parties' agreements to facts or sentencing

26  factors.

27    25.  Defendant understands that both defendant and the USAO are

28  free to: (a) supplement the facts by supplying relevant information

1   to the United States Probation and Pretrial Services Office and the

2   Court, (b) correct any and all factual misstatements relating to the

3   Court's Sentencing Guidelines calculations and determination of

4   sentence, and (c) argue on appeal and collateral review that the

5   Court's Sentencing Guidelines calculations and the sentence it

6   chooses to impose are not error, although each party agrees to

7   maintain its view that the calculations in paragraph 11 are

8   consistent with the facts of this case.  While this paragraph permits

9   both the USAO and defendant to submit full and complete factual

10   information to the United States Probation and Pretrial Services

11   Office and the Court, even if that factual information may be viewed

12   as inconsistent with the facts agreed to in this agreement, this

13   paragraph does not affect defendant's and the USAO's obligations not

14   to contest the facts agreed to in this agreement.

15      26.  Defendant understands that even if the Court ignores any

16   sentencing recommendation, finds facts or reaches conclusions

17   different from those agreed to, and/or imposes any sentence up to the

18   maximum established by statute, defendant cannot, for that reason,

19   withdraw defendant's guilty plea, and defendant will remain bound to

20   fulfill all defendant's obligations under this agreement.  Defendant

21   understands that no one -- not the prosecutor, defendant's attorney,

22   or the Court -- can make a binding prediction or promise regarding

23   the sentence defendant will receive, except that it will be within

24   the statutory maximum.

25                 NO ADDITIONAL AGREEMENTS

26      27.  Defendant understands that, except as set forth herein,

27   there are no promises, understandings, or agreements between the USAO

28   and defendant or defendant's attorney, and that no additional

1   promise, understanding, or agreement may be entered into unless in a

2   writing signed by all parties or on the record in court.

3   <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

4       28.  The parties agree that this agreement will be considered

5   part of the record of defendant's guilty plea hearing as if the

6   entire agreement had been read into the record of the proceeding.

7   AGREED AND ACCEPTED

8   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
9   CALIFORNIA

10  TRACY L. WILKISON
    United States Attorney

11

12  _____        12/1/2021

13  MELISSA MILLS                            Date
    Assistant United States Attorney

14  _____        11/21/2021

15  DAVID H. WRIGHT                          Date
    Defendant

16  _____        11/23/2021

17  ANTHONY PACHECO                          Date
    Attorney for Defendant DAVID H.
18  WRIGHT

19

20

21

22

23

24

25

26

27

28

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety.  I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney.  I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement.  No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement.  No one has threatened or forced me in any way to enter into this agreement.  I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

DAVID H. WRIGHT
Defendant

11/21/2021
Date

14

## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am DAVID H. WRIGHT's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

_____     11/23/21
ANTHONY PACHECO                       Date
Attorney for Defendant DAVID H.
WRIGHT

# ATTACHMENT A

**ATTACHMENT A**

FACTUAL BASIS

I.   **THE AVENTADOR BRIBERY SCHEME**

  A.   **Background**

  1.    Defendant DAVID H. WRIGHT was the General Manager of the Los Angeles Department of Water and Power ("LADWP") from September 6, 2016, until July 23, 2019, when he resigned at the direction of the Mayor of Los Angeles.  As the General Manager of LADWP, defendant WRIGHT was the chief executive of the largest municipal utility in the United States.

  2.    During 2016 and 2017, defendant WRIGHT developed a close personal relationship with Paul O. Paradis, a New York lawyer who was then involved with LADWP in multiple ways.  First, beginning in 2015, Paradis represented LADWP in an affirmative lawsuit against PricewaterhouseCoopers ("PwC"), wherein LADWP alleged that PwC — the vendor of LADWP's billing system — was to blame for LADWP's misbilling of hundreds of thousands of ratepayers.  Second, during 2015 and 2016, Paradis and his law firm held a contract with LADWP, valued at over $6,000,000, to provide project management services in connection with LADWP's remediation of the faulty billing system at issue in the lawsuit.

  3.    During their relationship, defendant WRIGHT and Paradis regularly met in person and exchanged thousands of emails and text messages.  Defendant WRIGHT and Paradis also traveled together for work and personal purposes, attended concerts and other events together, and dined together at expensive restaurants.  Paradis regularly paid for defendant WRIGHT at these outings.  Defendant

Defendant's initials:  ___   1

1  WRIGHT did not report any of these gifts or benefits on his Form 700
2  Statements of Economic Interest, as required by California law.
3      **B.    The Bribery Agreement**
4      4.    During late 2016 and early 2017, defendant WRIGHT and
5  Paradis discussed the prospect of Paradis performing additional
6  services for LADWP.  Paradis informed defendant WRIGHT that Paradis
7  could not provide future remediation services for LADWP through his
8  law firm due to state bar rules prohibiting law firms from providing
9  non-legal services.  Defendant WRIGHT and Paradis talked about
10 Paradis forming a new company that could provide future remediation
11 and other services to LADWP under a separate contract with LADWP.
12 Paradis informed defendant WRIGHT that he planned to seek a contract
13 in the amount of approximately $30,000,000.
14     5.    On February 10, 2017, defendant WRIGHT met privately with
15 Paradis at a hotel restaurant in Riverside, California.  During this
16 meeting, defendant WRIGHT and Paradis again discussed Paradis's
17 intent to create a new company, Aventador Utility Solutions, LLC
18 ("Aventador"), for the purpose of seeking a lucrative contract with
19 LADWP.  Defendant WRIGHT and Paradis agreed that in exchange for
20 defendant WRIGHT's support of the contract, Paradis would name
21 defendant WRIGHT as Aventador's Chief Executive Officer ("CEO") once
22 he retired from LADWP.  Specifically, pursuant to their agreement,
23 defendant WRIGHT would ensure that LAWDWP's five-person Board of
24 Commissioners (the "LADWP Board") awarded the contract to Aventador
25 without a competitive bidding process.  In exchange, defendant WRIGHT
26 would obtain, among other benefits, the job as Aventador's CEO at an
27 annual salary of approximately $1,000,000, and a luxury company car.
28

Defendant's initials: _____    2

Defendant WRIGHT and Paradis further discussed the need to keep their agreement confidential, because they knew that it was illegal.

6.    Defendant WRIGHT and Paradis worked together to select the company's name, "Aventador," which was the name of a model of the luxury car company Lamborghini.  Throughout the spring of 2017, defendant WRIGHT and Paradis discussed hiring and personnel decisions for Aventador, marketing strategies, pursuing business opportunities beyond LADWP, and the specific type of luxury car and other perquisites that defendant WRIGHT would get when he joined Aventador after retiring from LADWP.

7.    On or about March 28, 2017, pursuant to his agreement with defendant WRIGHT, Paradis registered Aventador with the California Secretary of State.

### C.    Defendant WRIGHT and Paradis Work To Position Aventador For a $30,000,000 No-Bid Contract With LADWP

#### 1.    The Plan

8.    After agreeing to the terms described above, defendant WRIGHT and Paradis agreed that they would take steps to position Aventador for a new contract with LADWP.  Defendant WRIGHT would, among other things, draft a letter (the "Board Letter") to the LADWP Board summarizing the purpose and terms of the proposed Aventador contract, touting Aventador's capabilities, and explaining why alternatives to awarding the contract on a no-bid basis were unsatisfactory.  Defendant WRIGHT would also lobby members of the LADWP Board to persuade them to vote in favor of the Aventador contract.  Defendant WRIGHT would enlist the help of LADWP employees, including other senior LADWP executives, to support the contract. Additionally, defendant WRIGHT would prepare an oral and written

Defendant's initials: _DW_ _    3

1  presentation to the LADWP Board urging approval of the Aventador

2  contract.

3      9.   Defendant WRIGHT and Paradis further agreed that Paradis

4  would leverage his personal relationship with the independent monitor

5  appointed by the court to oversee the court-ordered remediation of

6  LADWP's billing system ("Independent Monitor"), in support of the

7  Aventador contract.  Specifically, because Independent Monitor relied

8  on Paradis to draft his reports to the court and typically made few

9  or no changes, defendant WRIGHT and Paradis agreed that Paradis would

10 include in Independent Monitor's May 2017 report to the court a

11 detailed section laying a critical foundation of support for the

12 Aventador contract.  Defendant WRIGHT would then use the report,

13 prepared by Paradis, to aid his campaign to persuade the LADWP Board

14 that it had no choice but to award the $30,000,000 no-bid contract to

15 Aventador.

16      2.   Paradis Writes Independent Monitor's Report To Provide
            Defendant WRIGHT With Support For the Contract

17

18     10.  On May 5, 2017, Independent Monitor's report was filed with

19 the court.  Section IV of the report, which defendant WRIGHT reviewed

20 and approved and which Paradis drafted specifically to include

21 talking points for defendant WRIGHT to use to convince the LADWP

22 Board to approve the Aventador contract, stated, among other things,

23 that LADWP: was grossly understaffed in the Information Technology

24 ("IT") area; had difficulty hiring IT staff; lacked well-qualified IT

25 project management personnel; and lacked the ability to successfully

26 manage large-scale IT implementation projects.  The report went on to

27 state that, because of these deficiencies, LADWP needed to procure

28 these services through an outside vendor.

Defendant's initials: _DW_ __    4

11.   On May 5, 2017, before the report was filed, Paradis sent the draft report to defendant WRIGHT and then asked him, via text message, "Does it give you what you need?"  Defendant WRIGHT replied by confirming that the draft report provided the support that defendant WRIGHT needed to push the Aventador contract.

### 3.   Defendant WRIGHT Enlists Help and Support From Other LADWP Officials and Employees

12.   In early May of 2017, defendant WRIGHT spoke with a City official responsible for advocating on behalf of LADWP ratepayers and persuaded him to support the Aventador contract.

13.   In May and early June of 2017, defendant WRIGHT procured the assistance of other LADWP employees and officials to facilitate the award of the contract to Aventador.  In particular, defendant WRIGHT worked with Paradis and another senior executive of LADWP to draft and hone the Board Letter regarding the Aventador contract proposal.  Defendant WRIGHT, Paradis, and the senior LADWP executive each revised the draft and exchanged edited versions.  Defendant WRIGHT's changes to the draft included removing all by-name references to Paradis, as well as all specific references to Paradis's prior no-bid LADWP contract.  After defendant WRIGHT's edits, the Board Letter's reference to Paradis opaquely noted, "The contractor is uniquely situated to perform this work, and therefore, a sole source contract with Aventador is recommended."

14.   Defendant WRIGHT also edited the Board Letter to reference the May 5, 2017 Independent Monitor report — which defendant WRIGHT knew that Paradis had drafted for this purpose — as support for LADWP's supposed inability to perform the remediation work internally and the resulting need to outsource that work to an outside

Defendant's initials: _DW_     5

contractor.  Additionally, defendant WRIGHT added a provision to the Board Letter stating that it was not feasible for LADWP to contract with vendors other than Aventador because of time pressures that he portrayed as mandated by the court.

15.  In early June of 2017, defendant WRIGHT solicited the aid of two senior LADWP employees to find and send him information in support of the Aventador contract.  Defendant WRIGHT advised his employees that he was preparing a presentation on the contract for the upcoming LADWP Board meeting prior to the LADWP Board's vote on the contract, which he planned to present only if the LADWP Board asked, "why we are pursuing a single source $30M contract."  Defendant WRIGHT directed his employees to send him information that would make the need for the Aventador contract seem dire, so that he could articulate "the wors[t] case scenario if the Board doesn't approve the contract with Aventador."

        4.   <u>Defendant WRIGHT Lines Up the LADWP Board's Support For the Contract</u>

16.  To further the bribery arrangement, defendant WRIGHT knew that he needed to persuade the LADWP Board to vote in favor of the Aventador contract.  During May and early June of 2017, defendant WRIGHT spoke with multiple Board members individually and encouraged them each to vote in favor of the Aventador contract.

17.  On May 17, 2017, defendant WRIGHT informed Paradis via text that one of the Board members was "completely on board."  Later that day, defendant WRIGHT sent a text message to Paradis stating, "Been a couple of challenging days that got me down a bit.  I feel reenergized.  We will get this all done and fuck anyone that tries to get in the way.  Thanks for your help."

Defendant's initials:     6

18.   By June 4, 2017, defendant WRIGHT had obtained the support of multiple Board members.  Defendant WRIGHT did not tell any Board member about his corrupt arrangement with Paradis or his financial interest in Aventador.

**D.   Defendant WRIGHT's Board Presentation**

19.   On June 6, 2017, the LADWP Board convened for its regular meeting and to vote on the proposed $30,000,000 no-bid contract to Aventador.  Before the vote, defendant WRIGHT delivered prepared remarks urging the LADWP Board to vote in favor of the contract.

20.   During his remarks to the LADWP Board, defendant WRIGHT again cited the verbiage of the May 5, 2017 Independent Monitor report.  Defendant WRIGHT told the LADWP Board that LADWP could not meet its court-ordered obligations unless it contracted with Aventador, and he conveyed a sense of urgency to approve the Aventador contract.  Defendant WRIGHT did not disclose to the LADWP Board, either during the meeting on June 6, 2017, or at any other point, that he had agreed to accept an annual salary of approximately $1,000,000, a luxury company car, and the title of Aventador's CEO after retiring from LADWP.

21.   Following defendant WRIGHT's presentation, the LADWP Board voted unanimously to award Aventador a three-year, $30,000,000 no-bid contract.

**E.   Defendant WRIGHT's Continued Support For and Building of Aventador**

22.   On or about June 15, 2017, via text message, Paradis informed defendant WRIGHT that a member of the LADWP Board ("LADWP Board Member") had been repeatedly contacting Paradis to solicit Paradis's help on a legal matter.  Defendant WRIGHT replied by

Defendant's initials:  __   7

1  advising Paradis that LADWP Board Member was being appointed for
2  another four-year term on the LADWP Board, which defendant WRIGHT
3  suggested should "influence [Paradis's] thoughts a bit" on whether to
4  provide the solicited legal services to LADWP Board Member.
5  Defendant WRIGHT and Paradis agreed and understood that it was in
6  their mutual best interest for Paradis to continue to provide "free"
7  legal services to LADWP Board Member, because LADWP Board Member not
8  only sat on a committee of the LADWP Board charged with overseeing
9  the Aventador contract, but he would also be in a position to
10 influence future contract renewals, amendments, task orders, and
11 other actions related to the Aventador contract.
12      23.  During the remainder of 2017, throughout 2018, and into
13 early 2019, defendant WRIGHT continued to collaborate with Paradis to
14 build and market Aventador and to seek additional lucrative business
15 opportunities for Aventador both inside and outside LADWP.  Defendant
16 WRIGHT's actions included using his position as the General Manager
17 of LADWP to advertise Aventador's services at industry events and in
18 meetings and discussions with other industry officials and
19 executives.  Some illustrative, and non-exhaustive, examples include:
20      a.   In August of 2017, via text message, defendant WRIGHT
21 directed Paradis to "work magic" in drafting a class action
22 settlement agreement on behalf of LADWP by including language that
23 would create future business opportunities for Aventador.
24      b.   In November of 2017, via text message, defendant
25 WRIGHT told Paradis that they should do "the minimal possible" with
26 respect to the LADWP billing system upgrade so that the project would
27 not need to occupy defendant WRIGHT's attention for the remainder of
28

Defendant's initials:  DW  ___    8

1   his tenure at LADWP.

2           c.   In November of 2017, defendant WRIGHT attended an

3   industry event and used his position as the General Manager of LADWP

4   to market Aventador's services, which led to defendant WRIGHT

5   receiving inquiries from two potential Aventador customers.

6           d.   In May of 2018, defendant WRIGHT sought and obtained

7   from Paradis a "secure laptop" and an Aventador email account for

8   defendant WRIGHT to use.  Specifically, defendant WRIGHT asked for an

9   unattributable email account that could be falsely explained, if it

10  were ever discovered, as a precaution against "prying eyes by

11  unethical IT staff at LADWP."

12          e.   In June of 2018, defendant WRIGHT used his Aventador

13  laptop and email account to revise and transmit to Paradis a draft

14  written presentation to the LADWP Board touting Aventador's

15  cybersecurity capabilities and credentials.

16          f.   In July of 2018, defendant WRIGHT discussed various

17  Aventador branding and marketing strategies with Paradis, including

18  defendant WRIGHT's proposal to use his publicly known status as a gay

19  man to take advantage of a diversity-oriented initiative to benefit

20  Aventador.

21          g.   In August of 2018, following a cyber intrusion against

22  LADWP, defendant WRIGHT directed Paradis to have Aventador staff

23  create a presentation describing the attack and relaying Aventador's

24  findings.  Defendant WRIGHT opined that this could be used as a

25  "[p]latform for increasing Aventador required work."

26          h.   On multiple occasions in late 2018 and early 2019, via

27  text message, defendant WRIGHT conveyed to Paradis that he was ready

28

Defendant's initials: _____ _____   9

to leave LADWP, and they discussed how defendant WRIGHT would use his remaining tenure as the General Manager of LADWP to obtain an extension of Aventador's contract and otherwise enhance Aventador's future financial prospects.

   **F.    Defendant WRIGHT and Paradis Expand Their Corrupt Aventador Plans**

   24.   In May of 2018, defendant WRIGHT and other LADWP officials and employees, along with Paradis, joined a delegation on a visit to Israel.  During the trip, defendant WRIGHT, Paradis, and others met with executives from a global company that provided cybersecurity training to governmental and business organizations ("Cyber Company").  Cyber Company had franchises in the United States and abroad, and defendant WRIGHT and Paradis decided to invest in bringing a Cyber Company facility to Los Angeles.  Defendant WRIGHT and Paradis agreed that Paradis would put up $5,000,000 in capital and would have a controlling interest, and that defendant WRIGHT would have an ownership interest.  Defendant WRIGHT told Paradis that LADWP would purchase five years of cybersecurity training at the franchise facility, at a cost of $3,000,000 per year.  As the General Manager of LADWP, defendant WRIGHT did not have the formal authority to make this commitment on behalf of LADWP without action by the LADWP Board.  Defendant WRIGHT and Paradis agreed that defendant WRIGHT would use his position and influence at LADWP to convince the LADWP Board to support this expenditure, which both defendant WRIGHT and Paradis knew would secretly benefit them both financially.  In January 2019, pursuant to his agreement with defendant WRIGHT, Paradis entered into a joint venture agreement with Cyber Company wherein Paradis agreed to pay $5,000,000 to open a Cyber Company

Defendant's initials: _____  10

1  facility in Los Angeles that would provide training to LADWP
2  employees.

3  **II. DEFENDANT WRIGHT DESTROYS EVIDENCE OF HIS CORRUPT AVENTADOR**
   **PLANS AND ACCEPTS A SECRET FINANCIAL INTEREST IN AVENTADOR'S**
4  **SUCCESSOR COMPANY**

5      25.  On March 6, 2019, defendant WRIGHT learned that Paradis had
6  been forced to resign from his representation of the City in its
7  lawsuit against PwC.  Via text message, defendant WRIGHT instructed
8  Paradis to publicly message that Paradis had resigned in order to
9  focus his efforts on Aventador.  Defendant WRIGHT also told Paradis
10 that they should not be seen in public together, including on an
11 upcoming trip to London that they had previously planned for the
12 purpose of promoting Aventador.

13     26.  Shortly thereafter, the LADWP Board voted to terminate the
14 Aventador contract.  However, the LADWP Board agreed to retain the
15 company's services if Paradis sold his stake in the company and
16 disavowed any interest in the company, which Paradis purported to do.

17     27.  In late March of 2019, after Paradis sold the company to an
18 employee, Aventador officially changed its name to Ardent Cyber
19 Solutions, LLC ("Ardent").

20     28.  In late March of 2019, defendant WRIGHT met with Paradis in
21 private at defendant WRIGHT's home.  Defendant WRIGHT told Paradis
22 that he feared that their relationship and their corrupt plans for
23 Aventador would be discovered.  Accordingly, defendant WRIGHT
24 directed Paradis to destroy their incriminating text messages and
25 emails from defendant WRIGHT's cell phone and Apple iCloud account,
26 and to take back the Aventador laptop and wipe it clean.  Defendant
27 WRIGHT told Paradis that he had already gone through his office at

28

Defendant's initials: ___  11

1  LADWP and destroyed all incriminating physical evidence.  Defendant

2  WRIGHT took these concealment and destruction steps in order to avoid

3  detection of his crimes by the Federal Bureau of Investigation

4  ("FBI"), among other law enforcement authorities.

5     29.  At this meeting, defendant WRIGHT told Paradis that he

6  still wanted to continue their secret plans for the company formerly

7  known as Aventador and for Cyber Company.  Defendant WRIGHT and

8  Paradis agreed that they would need to create a new company, which

9  they referred to as "Newco," to replace Aventador and its successor

10 Ardent, because those companies were tarnished as a result of recent

11 bad publicity.  After they discussed increasing defendant WRIGHT's

12 share in their company, defendant WRIGHT told Paradis that when

13 Aventador's contract was terminated, defendant WRIGHT felt that his

14 future had "died," but that in light of their new agreement to

15 continue with Newco and Cyber Company, defendant WRIGHT felt

16 "resurrected."  Defendant WRIGHT expressed ongoing worries that their

17 incriminating communications would be discovered.  Paradis suggested

18 that he could obtain "burner" phones as a way for them to communicate

19 without fear of detection, and defendant WRIGHT asked him to do so.

20    30.  On April 3, 2019, defendant WRIGHT went to a café in

21 downtown Los Angeles to conduct an orchestrated "dead drop" encounter

22 with Paradis, so that defendant WRIGHT could secretly obtain his

23 wiped phone and a burner phone from Paradis.  As they had agreed

24 before the encounter, defendant WRIGHT entered the café and saw

25 Paradis seated near the back with a paper bag on the table.

26 Defendant WRIGHT gave a prearranged signal, and Paradis left the bag

27 on the table and walked to the restroom.  Defendant WRIGHT approached

28

Defendant's initials: _____  12

1 the table, took the bag containing the two phones, and left the café
2 before Paradis returned from the restroom.  Defendant WRIGHT engaged
3 in this conduct in order to conceal his bribery and other criminal
4 activity from law enforcement, including the FBI.

5    31.  In early April of 2019, defendant WRIGHT used his position
6 and influence as the General Manager of LADWP to urge the LADWP Board
7 to support the award of a new cybersecurity contract to Ardent for
8 over $10,000,000.  Because of his secret future plans with Paradis,
9 which stemmed from their business model for Aventador and its
10 successor companies, defendant WRIGHT knew that the award of this
11 Ardent contract would benefit him financially, either directly or
12 indirectly, and he intentionally did not disclose that fact to the
13 LADWP Board.

14    32.  Throughout April and May of 2019, defendant WRIGHT
15 repeatedly reaffirmed to Paradis his commitment to secretly lobby on
16 behalf of Ardent and Cyber Company during the remainder of his tenure
17 at LADWP, and to officially begin working with Paradis after his
18 retirement from LADWP.  In addition to the terms of employment to
19 which they had already agreed, defendant WRIGHT requested a
20 "substantial sign-on bonus" of $600,000 or $1,200,000, as well as an
21 increase in his interest in the company.  Defendant WRIGHT also
22 suggested that he should remain at LADWP until he had finished
23 securing the new contract for Ardent, but that in the meantime, he
24 could unofficially begin working for Newco behind the scenes before
25 leaving LADWP.  Defendant WRIGHT told Paradis that he could not
26 receive any money for that work while at LADWP, because defendant
27 WRIGHT knew that this would be both illegal and a violation of
28

Defendant's initials: _____ 13

ethical rules.  Defendant WRIGHT proposed that he could instead be compensated for that work with "some retroactive money" after retiring from LADWP.  In proposing this illicit payment arrangement, defendant WRIGHT referred to Paradis as his "ATM," or automatic teller machine.

33.  On June 6, 2019, defendant WRIGHT was voluntarily interviewed by the FBI and the United States Attorney's Office ("USAO").  During that interview, defendant WRIGHT falsely stated that he did not have any financial or business interest, including a future financial or business interest, in Aventador, any successor or affiliate company, or any company with which Paradis was associated. Defendant WRIGHT knew that these statements were untrue and that his conduct was unlawful.

## III. DEFENDANT WRIGHT'S CRIMINAL OFFENSES

### A.   Conspiracy

34.  Beginning on or about February 15, 2017, and continuing through on or about March 6, 2019, defendant WRIGHT knowingly and willfully conspired and agreed with Paradis and others to knowingly and intentionally commit honest services wire fraud and federal program bribery.

### B.   Honest Services Fraud

35.  Between on or about February 10, 2017, and on or about June 6, 2019, defendant WRIGHT knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud LADWP and its ratepayers as to material matters, including by depriving LADWP and its ratepayers of their right to the honest services of defendant WRIGHT, who, as the General Manager of LADWP, owed a fiduciary duty

Defendant's initials: _____   14

1   to LADWP and its ratepayers.

2      36.   Defendant WRIGHT did so with the intent to obtain money and

3   property by means of materially false and fraudulent pretenses,

4   representations and promises, to wit, by using his position as

5   General Manager of LADWP to enrich both defendant WRIGHT and Paradis

6   through the procurement of a $30,000,000 no-bid LADWP contract for

7   Aventador, a company in which defendant WRIGHT had a covert financial

8   interest and Paradis had an overt financial interest, and through the

9   concealment of material information.   Defendant WRIGHT and Paradis

10  carried out this scheme, in part, by using and causing others to use

11  wire communications in interstate commerce, including the following

12  items:

13      a.   On May 4, 2017, Paradis sent via email a draft of the

14  independent monitor's report, which included a section designed to

15  support the Aventador contract, to the independent monitor, blind-

16  copying defendant WRIGHT on the email.

17      b.   On May 25, 2017, defendant WRIGHT sent an email to

18  Paradis with a draft of the Aventador Board Letter designed to

19  persuade the LADWP Board to vote in favor of the Aventador contract.

20      c.   On June 7, 2018, defendant WRIGHT sent an email to

21  Paradis with a draft presentation to the LADWP Board touting

22  Aventador's cybersecurity capabilities.

23  **C.   Federal Program Bribery**

24      37.   Between on or about February 10, 2017, and on or about June

25  6, 2019, defendant WRIGHT, an agent of LADWP, corruptly solicited and

26  demanded for his own benefit something of value from Paradis,

27  intending to be influenced and rewarded in connection with a

28

Defendant's initials: ___ 15

1  business, transaction, and series of transactions of LADWP having a
2  value of $5,000 or more.  Specifically, defendant WRIGHT corruptly
3  solicited and demanded financial benefits, including a future
4  financial interest in Aventador, the promise of a post-retirement job
5  as the CEO of Aventador with an annual salary of approximately
6  $1,000,000, and related perquisites, meals, travel, and event
7  tickets.  Intending to be influenced and rewarded in connection with
8  a $30,000,000 no-bid LADWP contract award to Aventador, defendant
9  WRIGHT engaged in the following official acts: (1) generating and
10 submitting a Board Letter intended to persuade the LADWP Board to
11 vote in favor of Aventador's contract; (2) meeting and conferring
12 with individual LADWP Board members to advocate on behalf of the
13 Aventador contract and to solicit the Board members' votes;
14 (3) preparing and delivering a presentation to the LADWP Board
15 asserting that there were no viable alternatives to the Aventador
16 contract, that the need for Aventador's services was dire and
17 immediate, and urging the Board to vote in favor of the contract;
18 (4) exerting pressure on LADWP Board members and other LADWP City
19 officials and employees to influence the approval process of the
20 Aventador contract.  At all relevant times, LADWP received federal
21 funds and benefits in excess of $10,000 annually.

22 **D.   Destruction of Evidence**

23      38.   Between on or about March 29, 2019, and June 6, 2019,
24 defendant WRIGHT knowingly destroyed records, documents, and tangible
25 objects with the intent to impede, obstruct, and influence a federal
26 criminal investigation, a matter that the defendant contemplated was
27 within the jurisdiction of the FBI and the USAO, both departments and

28

Defendant's initials:  DW __   16

1 | agencies of the United States.

2 |     **E.**     **False Official Statements**

3 |     39.   On June 6, 2019, defendant WRIGHT knowingly, willfully, and

4 | deliberately made materially false statements and representations to

5 | the FBI and the USAO during an interview knowing that these

6 | statements and representations were untrue and that his conduct was

7 | unlawful.   Defendant WRIGHT's false statements were made in a matter

8 | within the jurisdiction of the FBI and USAO and were material to the

9 | activities and decisions of the FBI and USAO.

Defendant's initials: _DW_ _____   17