TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
MELISSA MILLS (Cal. Bar No. 248529)
J. JAMARI BUXTON (Cal. Bar No. 342364)
SUSAN S. HAR (Cal. Bar No. 301924)
Assistant United States Attorneys
Public Corruption and Civil Rights Section
    1500 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-0627
    Facsimile: (213) 894-7631
    E-mail:     Melissa.Mills@usdoj.gov
            Jamari.Buxton@usdoj.gov
            Susan.Har@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR 21-559-SB |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM; DECLARATION OF MELISSA MILLS; EXHIBITS 1-11 |
| v. | |
| DAVID H. WRIGHT, | Hearing Date: April 26, 2022<br>Hearing Time: 8:00 a.m.<br>Location: Courtroom of the Hon. Stanley Blumenfeld |
| Defendant. | |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Melissa Mills, Jamari Buxton, and Susan Har, hereby files its sentencing memorandum.

1    This sentencing memorandum is based upon the attached memorandum of points

2    and authorities, the supporting declaration and exhibits, the files and records in this case,

3    and such further evidence and argument as the Court may permit.

4    Dated: April 12, 2022              Respectfully submitted,

5                                        TRACY L. WILKISON
                                         United States Attorney
6
                                         SCOTT M. GARRINGER
7                                        Assistant United States Attorney
                                         Chief, Criminal Division
8

9

10                                       MELISSA MILLS
                                         J. JAMARI BUXTON
11                                       SUSAN S. HAR
                                         Assistant United States Attorneys
12
                                         Attorneys for Plaintiff
13                                       UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **<u>TABLE OF CONTENTS</u>**

<u>DESCRIPTION</u>                                                                                      <u>PAGE</u>

TABLE OF AUTHORITIES ................................................................................. ii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

I.      INTRODUCTION ......................................................................................... 1

II.     STATEMENT OF FACTS .............................................................................. 2

      A.      Defendant's Corrupt Agreement .................................................... 3

      B.      Defendant's Secret Lobbying On Behalf of Aventador ..................... 3

      C.      Defendant's Secret Work On Behalf of Aventador After the Contract Award ........................................................................................ 6

      D.      Defendant's Destruction of Evidence ............................................. 7

      E.      Defendant's Renewal of Commitment To His Corrupt Agreement ............ 8

      F.      Defendant's False Statements To Federal Authorities......................... 9

III.    Procedural History ...................................................................................... 9

IV.     THE PRESENTENCE INVESTIGATION REPORT ........................................ 10

V.      THE GOVERNMENT'S SENTENCING RECOMMENDATION ..................... 11

      A.      Nature and Circumstances of the Offenses .................................... 11

      B.      General and Specific Deterrence .................................................. 15

      C.      Need to Reflect Seriousness of Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense ............................... 18

      D.      History and Characteristics of Defendant ...................................... 18

      E.      Avoidance of Sentencing Disparities ............................................ 23

VI.     CONCLUSION ........................................................................................... 23

# TABLE OF AUTHORITIES

<u>DESCRIPTION</u>                                                              <u>PAGE</u>

Cases

<u>United States v. Bistline</u>,
   665 F.3d 758 (6th Cir. 2012) ......................................................................20

<u>United States v. Ganim</u>,
   2006 WL 1210984 (D. Conn. May 5, 2006) ..............................................14

<u>United States v. Hill</u>,
   645 F.3d 900 (7th Cir. 2011) ......................................................................15

<u>United States v. Martin</u>,
   455 F.3d 1227 (11th Cir. 2006) ..................................................................16

<u>United States v. Morgan</u>,
   635 F. App'x 423 (10th Cir. 2015) ........................................................18, 21

<u>United States v. Mueffelman</u>,
   470 F.3d 33 (1st Cir. 2006) ........................................................................17

<u>United States v. Prosperi</u>,
   686 F.3d 32 (1st Cir. 2012) ........................................................................19

<u>United States v. Spano</u>,
   411 F. Supp. 2d 923 (N.D. Ill. 2006) ..........................................................16

<u>United States v. Stefonek</u>,
   179 F.3d 1030 (7th Cir. 1999) ....................................................................17

<u>United States v. Treadwell</u>,
   593 F.3d 990 (9th Cir. 2010) ......................................................................17

Statutes

18 U.S.C. § 371 .................................................................................................9

18 U.S.C. § 666 .................................................................................................9

18 U.S.C. § 1001(a)(2) ......................................................................................9

## TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                                                                PAGE

18 U.S.C. § 1519 ....................................................................................................9

18 U.S.C. § 1343 ....................................................................................................9

28 U.S.C. § 994(d) ...............................................................................................19

Rules

U.S.S.G. § 2B1.1(b)(1)(I) ...................................................................................10

U.S.S.G. § 2C1.1(a)(1) ........................................................................................10

U.S.S.G. § 2C1.1(b)(3) ........................................................................................10

U.S.S.G. § 3C1.1 .................................................................................................10

U.S.S.G. §§ 5H1.2 ...............................................................................................19

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.   INTRODUCTION

3

Defendant was entrusted with leadership of the Los Angeles Department of Water

4 and Power ("LADWP"), the largest public utility in the United States, in September

5 2016.  Just a few months after assuming this position of public trust, defendant embarked

6 on a brazen campaign of corruption, agreeing to fix an inflated and reportedly

7 unnecessary **$30,000,000** no-bid LADWP contract for a newly formed company,

8 Aventador Utility Solutions, LLC ("Aventador"), in exchange for the promise of future

9 wealth in the form of a lucrative job as Aventador's CEO.  Enlisting the help of several

10 of his subordinates at LADWP and leveraging his role and influence with the LADWP

11 Board of Commissioners ("Board"), defendant exploited his unique control over

12 taxpayer funds and doggedly pushed the contract through, warning of fictitious

13 exigencies and catastrophic consequences if the Board failed to follow his self-serving

14 recommendation.

15 Defendant did not stop there.  For two years after the Aventador contract was

16 awarded, he continued to cash in on his position at the head of LADWP, repeatedly

17 making institutional decisions that would secretly enrich him by benefiting Aventador.

18 Defendant did so with blatant disregard for the best interests of LADWP, its thousands

19 of employees, and its millions of ratepayers, and his self-interested actions were at times

20 to the direct and immediate disadvantage of the institution in his stewardship.

21 When his co-conspirator came under scrutiny, defendant took steps to destroy

22 their corrupt communications and hide their continuing association, but he did not use

23 that opportunity to reflect on or repudiate their illegal conduct.  Instead, defendant took

24 extra care to ensure that their communications and meetings were secure, and then he

25 doubled down on their illicit plans.  And when confronted by law enforcement,

26 defendant initially continued his campaign of obstruction by lying to cover his tracks.

27 Defendant's shameless betrayal of the public trust and his repeated efforts to

28 obstruct justice are highly aggravating, as reflected in the agreed-upon sentencing factors

and the applicable Guidelines range of 135-168 months — even the low end of which is higher than the statutory maximum for the crime by which the government permitted defendant to resolve his case.  However, those aggravating factors should be balanced against the mitigating factors in this case, which include defendant's fulsome acceptance of responsibility and his modest, yet repeated and apparently genuine, efforts to aid the investigation after coming to terms with the evidence against him.  Upon weighing those competing considerations and other applicable sentencing factors, the government respectfully recommends the following sentence: (1) a 97-month term of imprisonment; (2) a three-year term of supervised release; (3) a $100,000 fine; and (4) a special assessment of $100.

## II.   STATEMENT OF FACTS[1]

Defendant was appointed as LADWP's General Manager in September 2016.  In that capacity, he was entrusted with leading the largest public utility in the United States, which had an annual operating budget of billions of dollars, engaged more than 10,000 employees, and served more than four million customers in and around Los Angeles.

In and around 2016, defendant formed a close personal and professional relationship with Paul Paradis, a New York lawyer who was by then involved with LADWP in multiple ways, including holding a no-bid technical services contract valued at more than $6,000,000, and representing LADWP in an affirmative lawsuit against the vendor of its billing system.  For years, Paradis regularly treated defendant to concerts, sporting events, expensive meals, and other outings.  Under the California law requiring high-level public officials to report any financial benefits to the state — an important anti-corruption measure intended to ensure transparency and guard against bribery — defendant was legally required to report these gifts and benefits, but he never did so.

---

[1] Unless indicated otherwise, all facts herein are drawn from the stipulated factual basis in defendant's plea agreement (Clerk's Record ("CR") 7 at 17-33).

2

### A.    Defendant's Corrupt Agreement

In February 2017, defendant and Paradis met in private at a hotel restaurant and discussed Paradis's plan to form a new company, Aventador, for the purpose of seeking another lucrative no-bid contract with LADWP.  Defendant told Paradis that he would use his position and influence to secure the contract for Aventador in exchange for the promise of a job as Aventador's Chief Executive Officer when defendant retired from LADWP, an annual salary of $1,000,000, a luxury company car of defendant's choosing, and other perks.  Defendant and Paradis agreed to these terms, and they also resolved to keep their agreement secret, because they knew it was illegal.

### B.    Defendant's Secret Lobbying On Behalf of Aventador

Throughout the spring of 2017, defendant worked to uphold his end of the corrupt bargain, lobbying individual members of the LADWP Board to persuade them to vote in favor of the $30,000,000 no-bid Aventador contract.  Defendant also enlisted the help of subordinate LADWP employees, including other senior LADWP executives, to support the contract.  Among other things, defendant asked these executives to help him paint for the Board a picture of the "worst-case scenario" if the Aventador contract were not awarded.  As the June 6, 2017 Board vote neared, defendant prepared and honed an impassioned oral pitch that he would use to urge the LADWP Board to award the Aventador contract.  Defendant also worked with other senior executives to prepare a letter to the LADWP Board alleging an urgent need to award the contract to Aventador, claiming the lack of alternatives to doing so on a no-bid basis, and warning of the dire consequences that would befall LADWP if the Board declined to award the contract. Mills Declaration, Exhibit 1.

In a text message to Paradis on May 17, 2017, defendant expressed his defiance and his intent to muscle the contract through any resistance that might be offered, stating, "We will get this all done and fuck anyone that tries to get in the way."  Around the time of the Board vote, well-meaning LADWP employees did indeed "try to get in the way," expressing skepticism of the extraordinary fashion in which the $30,000,000

no-bid Aventador contract was being rammed through the Board and suspicion as to Aventador's recent formation, lack of relevant experience, and sky-high rates. For example, in May 2017, Gwendolyn Williams, the LADWP Assistant General Manager for Supply Chain Services, repeatedly and strongly voiced concerns about the Aventador contract, including that the proposed rates were outrageously high and dramatically above those of other would-be competitor companies, that a no-bid award was not appropriate in the case of a contract for the astronomical amount of $30,000,000, that the scope of work was not sufficiently defined, and that Aventador was a newly formed company that had never been vetted. Mills Declaration, Exhibit 2 at 2-3. When her objections fell on deaf ears, Williams flatly refused to have anything to do with the contract. Id. at 2, Exhibit 3.

Williams also documented some of her serious concerns in a memo to defendant and the LADWP Chief Administrative Officer. Id. The memo articulated the necessity for a competitive bidding process and analyzed Aventador's proposed rates for the project (averaging about $400 per hour). Id. at 2. In particular, it showed that Aventador's rates were significantly higher than those of similar LADWP contractors, and more than double the average rates of at least one comparable contractor. Id. at 1-2. The memo also explained that Aventador's extraordinarily high across-the-board rates would result in a far higher overall contract cost, because while another company might have a single senior manager with an hourly rate of close to $400, that manager would only bill on an as-needed basis for project management, whereas Aventador's proposal called for multiple high-billing employees to work on a "nearly full time basis." Id. at 2. Defendant received, and buried, this memo. Williams, unaware that defendant had secretly arranged a job as Aventador's CEO for a seven-figure annual salary, later told the FBI that she did not understand why defendant had "steamrolled" the Aventador contract through. Mills Declaration; Exhibit 2 at 4.

On the day of the Board vote, LADWP Senior Information Systems Manager Michael Botnick sent defendant and several other senior LADWP executives a

4

whistleblower-style email voicing his own concerns "as a citizen, a ratepayer, and a DWP veteran," and professing to also speak for "multiple fellow employees concerned about this topic." Mills Declaration, Exhibit 4. Among other issues, Botnick's email noted that Aventador's formation just three months prior did not "lend itself much time to develop a track record," and he expressed the concern that LADWP was "[n]ot responsibly utilizing the public's funds." Id. Defendant swiftly delivered a reply-all dismissing the dissenting views of Botnick and other subordinates, explaining that defendant "did not recommend this path without a lot of thought and consideration," and parroting his false statements to the Board that the Aventador contract was needed to "meet the current timeframe" and to "stay on track with court orders." Id.

On June 6, 2017, defendant addressed the Board immediately prior to the Aventador vote. Mills Declaration, Exhibit 5. Defendant's speech was infused with false exigence, ominously warning that the court-ordered independent monitor had left LADWP no choice but to immediately award Aventador a $30,000,000 contract.[2] As defendant well knew, the report of the "independent monitor" upon which defendant's salesmanship for the Aventador contract heavily relied — and the stark urgency of which defendant echoed — had been secretly ghost-written by none other than Paradis, defendant's co-conspirator who stood to benefit handsomely from the $30,000,000 contract award to his company.[3] Mills Declaration, Exhibit 6. Leaning further into the false emergency allegedly conveyed by the independent monitor, defendant also told the LADWP Board that the department's standard procurement process could not be opened up to other bidders because there was no time, so Aventador was the only option. Mills Declaration, Exhibit 5.

---

[2] As detailed herein and in Exhibit 7, after reviewing for the first time defendant's oral presentation to the LADWP Board citing the independent monitor's report as requiring that the contract be imminently awarded, the independent monitor told the FBI that defendant's presentation was "just not true," "there was no emergency, period," and "there was no need for this contract." Mills Declaration, Exhibit 7.

[3] Before finalizing the report, Paradis sent it to defendant and asked whether it gave defendant what he needed to push the contract through the Board. Defendant replied that it did.

Defendant's fearmongering to the Board was successful. Following defendant's remarks, the LADWP Board President amplified defendant's warnings that imminent catastrophic consequences would result from a failure to award Aventador the $30,000,000 no-bid contract. In the Board President's words to defendant:

> I don't think we have any choice but to do what you are recommending. Because if we don't end up meeting the requirements that have been imposed upon us by the court, the disaster that will befall us at that time will make the last one look like child's play.

Exhibit 5. Immediately thereafter, the Board unanimously voted to award the Aventador contract.

## C.    Defendant's Secret Work On Behalf of Aventador After the Contract Award

After the LADWP Board awarded the contract to Aventador, defendant continued to furtively work with Paradis to build and market Aventador. Unsatisfied with just the $30,000,000 LADWP contract, defendant used his role and influence as LADWP's General Manager throughout the remainder of 2017, 2018, and into 2019 to seek additional lucrative business opportunities for Aventador inside and outside of LADWP.

Defendant made clear, in both words and actions, that his primary interest was in serving Aventador and his own financial gain — not the public utility that he led, the City that had entrusted him with that important responsibility, or the taxpayers that underwrote his substantial salary package. Defendant's stated justification for the $30,000,000 Aventador contract was the allegedly urgent need for its work on the LADWP billing system upgrade; however, in November 2017, soon after expressing critical urgency to the Board for that project and only a few months in to the three-year Aventador contract, defendant directed Paradis that Aventador should do "the minimal possible" with respect to the upgrade so that defendant would not need to spend time and energy on that project during his remaining time at LADWP. Meanwhile, defendant's communications with Paradis showed him redirecting his time and energy to building and hyping Aventador's brand. And in 2018, defendant capitalized on a cyber attack at

LADWP, seeking to use it as a platform for increasing Aventador's work, stature, and revenue.

In 2018 and 2019, defendant purported to commit LADWP to purchase $15,000,000 in training over three years from a foreign cybersecurity company that Paradis had invested in and planned to franchise in Los Angeles. As defendant knew, he did not have the authority to make that commitment on behalf of LADWP; however, he intended to use his influence with the Board to convince them to support the expenditure, which would secretly benefit him financially.

### D.   Defendant's Destruction of Evidence

In March 2019, Paradis was forced out of his engagements with LADWP under a cloud of suspicion (later confirmed) that he was self-dealing. Rather than use this development to reflect on his own corrupt actions with Paradis and their potential consequences, defendant doubled down, reaffirming his commitment to their criminal conspiracy and making plans for a new successor company that would not be tainted by the now-tarnished Aventador brand. But defendant knew that his plans and actions were illegal, and he did not want to be caught. Defendant thus undertook significant efforts to conceal his continuing association with Paradis and to destroy evidence of their criminal conduct, including directing Paradis to delete incriminating text messages and emails from defendant's phone and iCloud account, destroying incriminating physical evidence stored in his LADWP office, and directing Paradis to take back and wipe clean the Aventador laptop that defendant had obtained from Paradis for the purpose of secretly performing Aventador work. Defendant also asked Paradis to obtain unattributable "burner" cell phones for them to secretly communicate. In April 2019, defendant orchestrated and conducted an clandestine dead-drop maneuver with Paradis to obtain his burner phone and his wiped cell phone from Paradis. See Mills Declaration, Exhibits 8-9.

**E.     Defendant's Renewal of Commitment To His Corrupt Agreement**

In late March 2019, defendant told Paradis — who was by then, unbeknownst to defendant, cooperating with the FBI — that he still wanted to continue their longstanding project of building and marketing Aventador in preparation for defendant's eventual employment as Aventador's CEO, a job that defendant still intended to claim (after staying long enough at LADWP to secure significant taxpayer-funded retirement benefits).  Specifically, defendant had the following exchange with Paradis during a private meeting at defendant's home on March 29, 2019, which Paradis recorded at the direction of the FBI:

| | |
|---|---|
| Wright: | The future with Aventador and [Cyber Company A] died for me, so now I'm resurrected again. |
| Paradis: | Yeah. |
| Wright: | Do you know what I mean? |
| Paradis: | And- and I'm not going to call it died.  And we didn't have a chance to talk about it.  In my mind it was deferred, um, and that's why I wanted to have this conversation.  So. |
| Wright: | And I was hoping that. |

Mills Declaration, Exhibit 10.

Defendant thereafter continued to further his corrupt plans with Paradis, including using his position and influence to convince the LADWP Board to support the award of a new cybersecurity contract to Aventador's successor company, Ardent, for over $10,000,000 in April 2019.  Defendant also asked Paradis for additional compensation in the form of a "substantial sign-on bonus" of either $600,000 or $1,200,000 and an additional ownership interest in their company.  Moreover, although defendant repeatedly expressed eagerness to leave LADWP and to do minimal work while there, he told Paradis that he would continue playing the role of General Manager until he had finished securing another new contract for Ardent.  Defendant assured Paradis that in the meantime, he would be unofficially working for their company behind the scenes.  And while defendant acknowledged that he could not lawfully be paid for his secret work

8

while employed by LADWP, he suggested that he could instead be compensated with "some retroactive money" after securing his retirement with LADWP. In so doing, the General Manager of LADWP referred to Paradis — a contractor for whom he was secretly fixing a lucrative contract that would benefit them both — as his "ATM."

### F.   Defendant's False Statements To Federal Authorities

On June 6, 2019, defendant participated in a voluntary interview with the Federal Bureau of Investigation and the United States Attorney's Office at his residence. Defendant was asked specific questions about his affiliation with Paradis and his interests in Aventador and its successor companies. To conceal his crimes, defendant falsely stated that he did not have any financial or business interest — present or future — in Aventador, any successor or affiliate company, or any other company associated with Paradis.

## III.   Procedural History

On December 13, 2021, the government filed an information charging defendant with a single count of federal program bribery in violation of 18 U.S.C. § 666, along with a plea agreement between defendant and the government. The plea agreement was supported by a 17-page factual basis detailing defendant's admissions not only to the bribery charge, but also to conduct that violated 18 U.S.C. § 371 (conspiracy), 18 U.S.C. §§ 1343, 1346 (honest services wire fraud), 18 U.S.C. § 1519 (obstruction of justice by destroying documents), and 18 U.S.C. § 1001(a)(2) (false statements). The total applicable statutory maximum sentence for a violation of all of the offenses that defendant admitted to committing would be at least 60 years, assuming only one violation of each statute. However, in exchange for defendant's fulsome acceptance of responsibility pre-indictment, defendant's plea agreement permitted him to resolve his case with a plea to the single § 666 count, which carries a statutory maximum of ten years.

On January 25, 2022, in accordance with his plea agreement, defendant entered a plea of guilty to one count of federal program bribery in violation of 18 U.S.C. § 666.

1

## IV.    THE PRESENTENCE INVESTIGATION REPORT

On March 21, 2022, the United States Probation Office ("USPO") issued the presentence investigation report ("PSR"), along with a disclosed recommendation letter. CR 35, 36.  The PSR found, as stipulated to by the parties in the plea agreement, that the following sentencing guidelines factors were applicable:

| | | |
|---|---|---|
| Base Offense Level: | 14 | [U.S.S.G. § 2C1.1(a)(1)] |
| Value of bribe between $1.500.001-$3.500.000 | +16 | [U.S.S.G. § 2B1.1(b)(1)(I)] |
| Involved public official in high-level decision-making and sensitive position | +4 | [U.S.S.G. § 2C1.1(b)(3)] |
| Obstruction of justice | +2 | [U.S.S.G. § 3C1.1] |
| Acceptance of responsibility | - 3 | [U.S.S.G. § 3E1.1] |
| Total Offense Level | 33 | |

CR 36 ¶¶ 59-76.  The PSR indicated that defendant had no criminal history points, yielding a score of zero and a criminal history category of I.  Id. ¶¶ 81-82.  The PSR calculated defendant's resulting advisory sentencing guidelines range to be 135-168 months.  Id. ¶ 171.  However, the PSR noted that ten-year statutory maximum was lower than the low end of the applicable range, resulting in a guideline term of imprisonment of 120 months.  Id.  The PSR also calculated defendant's fine range at $35,000-$350,000, and found that defendant had an ability to pay a fine above the low end of the fine range.  Id. ¶¶ 167-68.  The government concurs with the PSR's analysis and calculations and does not find any other sentencing guidelines factors to be applicable.

The USPO's disclosed recommendation letter opined that certain mitigating factors, including defendant's educational and employment history, lack of prior law enforcement contacts, lack of success in obtaining the bargained-for benefits of his corrupt agreement, and medical and emotional issues, supported a substantial downward

variance to 72 months' imprisonment.[4] CR 35 at 6.  For the reasons set forth herein, the government respectfully disagrees with the mitigating factors identified by the USPO, some of which appear to improperly prioritize the socio-economic status of defendant. However, the government notes certain other mitigating factors and recommends a downward variance of three levels, to the resulting low end of 97 months' imprisonment.

The USPO letter also recommended a low-end fine of $35,000.  CR 35 at 1.  The government concurs that a fine within the applicable guidelines range is appropriate. However, in light of the nature and scope of the offense conduct, the financial nature of his crimes, his motivation of greed, and the USPO's supported finding that defendant "has the ability to pay a larger fine" than the low end (CR 36 ¶ 167), the government recommends a fine of $100,000.  Defendant's healthy financial situation, which includes his individual net worth of well over $600,000 and his monthly retirement income of over $12,600, should permit his ability to pay such a fine.  Id. ¶ 154.

THE GOVERNMENT'S SENTENCING RECOMMENDATION

### A.    Nature and Circumstances of the Offenses

Defendant's offense conduct is undeniably aggravating.  As the stipulated factual basis and the PSR articulate at great length, defendant shamelessly exploited his position as LADWP's highest official, betraying both the critical-infrastructure organization that he was entrusted to lead and the City officials who selected him with that important responsibility.  His motive was naked greed — he sought to cash in on the public trust for his own personal wealth and advancement.  Moreover, while the USPO recommendation letter argues that the offense conduct represents a mere "deviation from an otherwise law-abiding life," CR 35 at 6, this was far from a limited misstep or one-time lapse of judgment.  Defendant chose the path of corruption and betrayal of the public trust in 2017, and he never looked back.  His extensive communications with

---

[4] Effectively, this would represent a six-level downward variance from defendant's applicable guidelines range, with a sentence slightly above the low end of the resulting range.

Paradis, wherein they engaged in elaborate preparations to build and market Aventador's brand, to find and exploit new business opportunities, and to lay the groundwork for Aventador's future financial success, make clear that defendant was playing the long game. He admittedly intended to stay at LADWP long enough to collect retirement benefits on his $500,000+ LADWP salary and benefits package[5], to use his role and influence within LADWP and in the community to position Aventador for as many lucrative business opportunities as possible, and then to slide into a profitable second career as Aventador's CEO.

### 1. The Temporal Scope of Defendant's Conduct

The extensive and lengthy course of defendant's criminal conduct at the expense of the institution that he was chosen to lead undermines the suggestion that his crimes represented a small and discrete blemish on an otherwise honorable and productive life. Over the nearly two-and-a-half years between his initial early-2017 decision to accept a corrupt arrangement with Paradis and the disruption of his crimes by law enforcement in June 2019, defendant had ample opportunity to consider his actions, correct his course, and choose a different path. Defendant did the opposite. He sought more business opportunities for Aventador both inside and outside LADWP, he leaned on the Board to leverage additional eight-figure contracts for Aventador's successor company, he purported to commit LADWP to purchase $15,000,000 in training from another company in which he and Paradis had a secret stake, and he asked for additional money and benefits from Paradis (including a signing bonus and an increased ownership interest in the company). When Paradis was forcibly removed from his LADWP entanglements in March 2019 amid allegations of corruption and self-dealing, this could have served as a belated wake-up call to defendant, alerting him that his illicit conduct could bear serious consequences. Instead, after an initial spate of self-protection in which defendant

---

[5] Defendant's total pay and benefits in 2018 reportedly amounted to $541,151.26. https://transparentcalifornia.com/salaries/2018/los-angeles-department-water-and-power/david-h-wright/

systematically destroyed all incriminating evidence and sought to publicly distance himself from Paradis, defendant reaffirmed his commitment to their criminal plans and resumed his secret work on behalf of Aventador's successor company with renewed vigor.

### 2.   The Critical Nature of LADWP and the General Manager's Role and Responsibilities

Many run-of-the-mill corruption cases involve low- or mid-level government employees who took bribes to augment their modest public salaries.  This is not such a case.  Defendant sat at the head of the largest public utility in America and was compensated in that role at the rate of more than half a million dollars a year.  After reaching what many would consider the pinnacle of a lucrative and distinguished career in public service, he repeatedly leveraged that apex position and his unsurpassed influence at LADWP to persuade the Board to make contracting decisions that would secretly enrich him.  Perhaps more egregiously, he directed his subordinates to help him in his quest to hawk Aventador's questionable wares.

Further adding to the seriousness of the offense is defendant's flagrant disregard for the potential impact on the critical infrastructure of LADWP, which is responsible for delivering electricity and water to virtually the entirety of the greater Los Angeles area, including to hospitals, fire departments, police stations, jails, military installations, government offices, businesses, schools, and households, all of whom depend on the vital services that LADWP provides.  The Aventador contract was at least nominally intended to remedy billing system flaws that had wreaked havoc on the financial and home lives of LADWP's customers for years, causing hundreds of thousands of ratepayers to be overbilled to their detriment or underbilled (or never billed) to the detriment of the institution and other ratepayers who bore the costs.  Beginning in 2018, a new Aventador task order shifted much of the contract's focus to cybersecurity work.  That defendant served his own secret financial interests by arranging for Aventador to address these important issues and secure this particular contract on a no-bid basis,

thereby icing out competitors that may well have been better qualified to perform this critical and highly sensitive work, is highly aggravating.

   3.   Damage To the Integral Public Institution That Defendant Was Entrusted To Lead

It is axiomatic, and has been repeatedly recognized, that public confidence in government suffers with every instance of corruption:

> Government corruption breeds cynicism and mistrust of elected officials. It causes the public to disengage from the democratic process because . . . the public begins to think of politics as 'only for the insiders.' Thus corruption has the potential to shred the delicate fabric of democracy by making the average citizen lose respect and trust in elected officials and give up any hope of participating in government though legitimate channels.

United States v. Ganim, 2006 WL 1210984, at *5 (D. Conn. May 5, 2006).  Defendant's egregious crimes were no exception; they further contributed to the erosion of the public's confidence in government and government officials, as powerfully articulated below by some of the victims impacted by defendant's corruption — the LADWP Board on behalf of its employees and the public they serve.

Throughout 2017, all of 2018, and into 2019, defendant resolutely pursued his corrupt plan, at times using his position as General Manager to advantage Aventador to the direct and immediate detriment of LADWP.  For example, shortly after secretly manipulating the LADWP Board to award a $30,000,000 no-bid contract to Paradis for the stated (and purportedly urgent) purpose of remediating the billing system, defendant directed Paradis to do "the minimal possible" on that very project, so that defendant would not have to be occupied with it during his remaining tenure at LADWP. Defendant's utter disregard for the best interests of the vital public utility that he was entrusted to lead is particularly aggravating.  Moreover, defendant's crimes inflicted incalculable institutional damage on LADWP.  The day after defendant's Information was made public, the current Board President reflected on that "***extraordinary damage, and the incredible breach of trust that was inflicted on this Department***":

> There is, and there are, no words to describe the level of outrage, sadness, and sense of betrayal felt by this Board and by the members of this Department, or the regret that we feel associated with ***the extraordinary***

> ***impacts of [defendant's] behavior, negative impacts, both as it relates to Department operations, but again, and more significantly, as it relates to the level of service that we provide to our customers*** . . . . I have full appreciation for the extraordinary pain associated with many of the employees, and particularly of many of the members of our senior management team, who worked closely, unbeknownst to them, with a now admitted person of ill repute who was in real time seeking to defraud the Department and committing crimes upon the Department. . . . I regret what has occurred, apologize to members of the public who are reading with dismay the events that have transpired at this Department, and want to also stand with the thousands of employees who come to work every day and give every measure their best at all times.

Mills Declaration, Exhibit 11. After the Board President's remarks, the current Board Vice President elaborated as follows:

> The actions of [defendant] have brought shame and disgrace. It has stained the trust that we have built over the years with our customers, our allies, our partners, and employees. It has disrupted our values and norms. And more importantly, it has impacted and disrupted our hardworking and dedicated employees. And I really want to focus on that today. Employee morale is hurting. At a time when the leaders of this organization are working to change our culture to embody more trust, transparency, inclusion, and accountability, this crisis comes before us. ***Corruption hurts everyone. Employees that know that they are working for an unethical organization where bribery is tolerated and practiced are more likely to be unmotivated and disinterested in their work***. And this negatively impacts performance, output, and overall staff morale. And this can lead to poor performance and high turnover. And when corruption and bribery takes place, resources are diverted from their appropriate and planned-for destination. ***Corruption reduces that infrastructure of our organization as well as the effectiveness of public investments.*** . . . As someone who has spent decades serving alongside our dedicated employees, it really sickens me to see their professional reputations damaged [by defendant's acts].

<u>Id.</u>

This Court can take a step toward remediation of this broad and immeasurable damage with a strong custodial sentence.

## B. General and Specific Deterrence

As is evident from a wide, and widely reported, swath of misconduct by public officials that has been exposed in numerous federal cases charged recently in this district, public corruption in the Los Angeles area is of paramount concern. The endemic nature of public corruption in a particular area is a factor that weighs heavily in favor of a substantial custodial sentence. <u>See</u> <u>United States v. Hill</u>, 645 F.3d 900, 911 (7th Cir. 2011) (finding that "widespread corruption in East St. Louis and the need to

deter future public corruption" were appropriately considered in support of an above-guidelines sentence for "the blatant abuse of power by a significant official in a corrupt area").

1.   General Deterrence

General deterrence is a unique concern in public corruption cases.  As one court noted:

> We need not resign ourselves to the fact that corruption exists in government.  ***Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable*.**  The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences.  Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants.  ***It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all*** — not only to the average citizen, but to all elected and appointed officials.

United States v. Spano, 411 F. Supp. 2d 923, 940 (N.D. Ill. 2006), *affirmed*, 477 F.3d 517 (7th Cir. 2006) (emphasis added).  General deterrence is a particularly effective tool in corruption and other white-collar cases, as white-collar criminals often premeditate their crimes and engage in a cost-benefit analysis.  See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.  Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment.").

Sentencing in public corruption and other white-collar criminal cases can present a unique risk of creating (or feeding the perception of) a two-tier system of justice — a more flexible and lenient tier for well-known or well-heeled white-collar defendants, and a more rigid, severe, and guidelines-oriented tier for "other" criminals.  See United States v. Musgrave, 761 F.3d 602, 609 (6th Cir. 2014) ("one of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes

16

and to eliminate disparities between white-collar sentences and sentences for other crimes") (internal citations omitted).  That dichotomy is inconsistent with the Constitution, with fundamental fairness, and with the statutory goals of sentencing, and it has been repeatedly repudiated by the courts.  See United States v. Treadwell, 593 F.3d 990, 1012–13 (9th Cir. 2010) (overruled on other grounds) (rejecting the principle that a defendant of means should be afforded a lower prison sentence to enable him to pay restitution to his fraud victims, and noting the critical importance of "the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail") (quoting United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006)); United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (white-collar criminals are "not to be treated more leniently than members of the 'criminal class'").

For these reasons, the substantial deviation from the guidelines recommended by USPO here is not supported by appropriate sentencing considerations, and it would undercut the deterrent purpose of sentencing and embolden future crimes.  A meaningful sentence in this case — which is undoubtedly being observed by other Los Angeles public officials and those in their orbit — will thus serve an important public purpose.

2.      Specific Deterrence

Specific deterrence also counsels in favor of a strong custodial sentence. Defendant actively sought to obstruct justice in multiple ways in this case before ultimately resigning to full accountability.  First, he endeavored to destroy evidence, including shredding physical documents, directing a co-conspirator to wipe all incriminating messages from his cell phone and iCloud account, and carefully executing a theatrical dead-drop maneuver to collect a burner phone in order to move his ongoing criminal communications to a more secure platform.  Second, when first confronted by law enforcement asking pointed questions about his financial ties to Aventador and Paradis, defendant chose to lie.  Only after it became clear that his back was against the wall, with the investigation in possession of copious evidence of his crimes, did

defendant admit those crimes.  These repeated acts of obstruction before a decision to accept responsibility make clear that a significant term of imprisonment is necessary to specifically deter this defendant from future criminal conduct.

### C. Need to Reflect Seriousness of Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense

The public has suffered as a result of defendant's self-serving greed, and it is important that the public observe the imposition of an appropriate sentence reflecting the seriousness of his admitted crimes.  Anything less risks compounding the harm of defendant's crimes by further undermining confidence not only in the American system of government, but in the American system of justice.

Public corruption is not a victimless crime.  The victim is our democratic system of government, the integrity of which is further weakened with every revelation that yet another public official's influence and favors are for sale.  Defendant's brazen and extensive corruption has further degraded an already cynical American public's trust in the fairness and integrity of government.  As outlined by the Board leadership's comments above, defendant's victims here also included LADWP, its thousands of employees, and its millions of ratepayers.  A strong sentence is necessary to punish defendant's conduct, promote respect for the law, and restore public faith in the system. As one court has observed: "The judicial response to demonstrated corruption by the political elite and the lapse of duty, honor, and integrity it represents is as important as the corruption itself."  United States v. Morgan, 635 F. App'x 423, 447 (10th Cir. 2015). Here, the appropriate judicial response to defendant's brazen and expansive corruption is a substantial custodial sentence.

### D. History and Characteristics of Defendant

#### 1. Aggravating Factors

As the PSR indicates, defendant has enjoyed numerous advantages in life.  Those advantages led to his influential position in public governance and the platform that allowed him to commit these crimes.  Specifically, the PSR reflects that defendant

enjoyed a healthy relationship with both parents, a relatively happy childhood (with the exception of some bullying at school), a good education, and a very amicable parting following a loving marriage, and that he continues to maintain positive and supportive relationships with his children, grandchildren, ex-spouse, long-time partner, other family members, friends, and other members of his community.  CR 36 ¶¶ 88-109, 119-129. The USPO's recommendation letter finds certain of these advantages, including defendant's "strong work ethic that has allowed him to earn an advanced degree and helped him to work his way up to the highest levels of the public utility industry," to be exclusively mitigating.  CR 35 at 6.  Recognizing that reasonable minds can differ on the consideration and proper weighting of various sentencing factors, the government respectfully disagrees.

As an initial matter, the USPO's perspective overlooks the fact that defendant had that same work ethic and enjoyed those same high-level employment opportunities throughout the time that he was abusing his position of public trust and fixing tens of millions of dollars in contracts for a company that had bribed him to do so — indeed, it was precisely that ambition and that climb to the top that afforded defendant the perch from which he was able to commit these crimes.  Moreover, the government looks at defendant's advantages through a different lens, one that is more consistent with judicial guidance and the Guidelines themselves.[6]  An abusive home, a traumatic childhood, an

---

[6] The USPO concluded that that defendant's "educational and employment record" (specifically, his college and graduate degrees and his advancement to "the highest levels of the public utility industry") were mitigating factors supporting a downward variance from the applicable guidelines (CR 35 at 7).  This analysis runs the risk of advocating the type of disparate treatment favoring certain classes of defendant that courts, Congress, and the Sentencing Commission have repeatedly found to be improper.  See United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."); see also 28 U.S.C. § 994(d) (requiring sentencing guidelines to be "entirely neutral as to ... socioeconomic status of offenders); U.S.S.G. §§ 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"); 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a departure is warranted"); 5H1.10 (socio-economic status is "not relevant in the determination of a sentence").

*(footnote cont'd on next page)*

upbringing in a gang-infested neighborhood, years spent languishing in failing schools, a community marred by the plague of addiction, a general hopelessness and dearth of available opportunity — <u>those</u> are mitigating factors.  Defendant enjoyed the opposite.  Unlike many defendants brought before this Court, defendant was privileged with a secure childhood, a loving and stable home, a solid education that opened the door to his undergraduate and graduate degrees, and the opportunity to build a highly successful professional career.  Defendant parlayed those advantages to claim a lofty platform from which he freely and eagerly chose to sell his influence to the highest bidder, and nothing about that is mitigating.

The fact that defendant's long-range corrupt agreement did not ultimately bear the riches that he intended was also considered as a mitigating factor by the USPO.  CR 35 at 6.  The government again disagrees.  The fact that, with the assistance of a cooperator, law enforcement detected and disrupted defendant's bribery scheme before it rewarded him with substantial fruit does not diminish the seriousness of defendant's conduct or the public harm that it caused.  Certainly, absent the intervention of law enforcement, defendant would currently be drawing a seven-figure annual salary as the CEO of Aventador, which would in turn be raking in money from the contracts and connections that defendant had skillfully leveraged while secretly acting on Aventador's behalf.

The fact that defendant enjoys the support of his family and community and has rallied friends and former colleagues to speak on his behalf, as indicated in the PSR, is somewhat mitigating.  CR 36 ¶¶ 119-129.  Those positive relationships will aid defendant's ability to rehabilitate following his conviction and sentence in this case.  However, while the Court should consider the offered letters and testimonials of support, it should place them in their proper context and refrain from giving them undue weight.

---

Collateral consequences "related to a defendant's humiliation before his community, neighbors, and friends would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines. And '[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose.'" <u>United States v. Bistline</u>, 665 F.3d 758, 760 (6th Cir. 2012) (citation omitted).

As the Tenth Circuit in <u>Morgan</u> stated, in noting its lack of surprise at the many letters offered in support of the defendant as he faced sentencing, "One does not become [a high-ranking public official] without the confidence of many supporters, some quite influential.  The letters must be viewed in that light."  635 Fed. Appx. at 449-50.  It should also be considered that defendant apparently enjoyed these same loving, supportive, healthy relationships with family, friends, and colleagues during the entire course of his criminal conduct, and that these positive influences did nothing through 2017, 2018, or the first half of 2019 to deter him from violating the public trust and trading his position for lucrative bribes.

### 2.   <u>Mitigating Factors</u>

While respectfully disagreeing with many of the factors found mitigating by the USPO, the government recognizes that defendant's extensive and egregious conduct is mitigated by certain other permissible factors.  After initially lying to investigators when confronted about his criminal conduct, and after then retaining legal counsel, defendant began to accept responsibility in the summer of 2019 and repeatedly made what the government views as sincere — though largely unproductive — efforts at cooperation.  Defendant proffered some information about other potential corruption-related conduct, and at the FBI's request, he participated in several covertly recorded conversations with other high-level officials to explore that conduct.[7]  And on the morning of the FBI's execution of search warrants at LADWP headquarters and other locations, defendant endeavored to provide a measure of additional assistance by appearing at LADWP headquarters to gauge and relay to investigators the reactions of other persons of interest to the investigation.  These actions did not rise to the level of "substantial assistance," and the government thus cannot move for a departure pursuant to U.S.S.G. § 5K1.1.  Nonetheless, the government believes that defendant's efforts were genuine and well-

---

[7]  The government also recognizes that in addition to providing some information that proved to be truthful, defendant refrained from opportunistically maligning others falsely in order to help his own situation, which both protected the rights of other people and saved the investigation time and resources.

21

intentioned.  In order to recognize them and to incentivize similar efforts in future cases, the government posits that they warrant a modest variance as a mitigating 3553(a) factor.

Similarly, defendant's forthrightness in accepting responsibility in this case warrants somewhat more credit than is accounted for in the standard provisions of U.S.S.G. § 3E1.1.[8]  Although it took some time for defendant to come to a place of acceptance, once he arrived at that place, he remained there fully and steadfastly, which saved the government time and resources in a complex and wide-ranging investigation involving numerous other people and facets.  Defendant and his counsel made themselves freely available to the government, including for factual questions and for the mechanics of navigating and drafting the detailed factual basis and charging language; he waived his right to indictment by grand jury and agreed to proceed by a criminal information; he readily agreed to a very fulsome factual basis at the request of the government, which positively impacted the government's larger investigation; he did not raise frivolous and time-consuming objections to specific facts that were supported by evidence and known to defendant; and he made clear that he was ready to enter a plea of guilty nearly immediately.  Together with the above-described efforts to cooperate, this demonstration of fulsome acceptance — which both allowed the government to devote valuable time and resources to other aspects of this complex investigation (and to other important investigations) and served the interests of judicial economy by saving the Court's time and resources — merits a modest but meaningful downward variance from the applicable Guidelines range of 135-168 months.

Collectively, the government considers these mitigating factors to warrant a downward variance of three levels, to level 30.[9]  The government further posits that the

---

[8]  For example, a defendant who exercised his rights to indictment by a grand jury, production of full pretrial discovery, and fulsome litigation of pretrial motions before timely notifying the government of his intent to plead guilty would typically be entitled to a three-level reduction pursuant to U.S.S.G. § 3E1.1.

[9]  It should be noted that defendant has already received a valuable benefit in consideration of those same mitigating factors.  Specifically, mindful of these factors, the government agreed to permit defendant to resolve his case with a plea to a single count

*(footnote cont'd on next page)*

interests of justice support a sentence at the low end of that applicable range (97 months).

### E.   Avoidance of Sentencing Disparities

While defendant is entitled to some leniency for the reasons described herein, an unduly light sentence here would lead to unwarranted sentencing disparities with less culpable defendants who do not enjoy the same status, connections, and resources as defendant.

## V.   CONCLUSION

Above all, the Court should avoid sending a message that while the advisory guidelines are applicable to the vast majority of defendants in the heartland of cases, well-known and well-heeled white-collar criminals who do not fall outside the heartland of white-collar cases should nonetheless be privileged with a more lenient tier of justice. This country has only one federal justice system, and a strong custodial sentence is required in this case.

For the reasons articulated herein, the government respectfully requests that this Court impose the following sentence: (1) a 97-month term of imprisonment; (2) a three-year term of supervised release; (3) a $100,000 fine; and (4) a special assessment of $100.

---

of federal program bribery, notwithstanding evidence beyond a reasonable doubt of (and his admissions in the factual basis to) several other crimes, including those with higher statutory maximum sentences.  Defendant's plea agreement thus already affords him the significant benefit of protection against the possibility of a sentence within his applicable sentencing guidelines range of 135-168 months, which is substantially higher than the ten-year statutory maximum of the count to which he pleaded guilty.