**VEDDER PRICE (CA), LLP**
Anthony Pacheco (Cal. Bar No. 128277)
apacheco@vedderprice.com
Maura L. Riley (Cal. Bar No. 319826)
mriley@vedderprice.com
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T:  +1 424 204 7700
F:  +1 424 204 7702

**VEDDER PRICE P.C.**
Brooke E. Conner (*Pro Hac Vice*)
bconner@vedderprice.com
222 N. LaSalle Street
Chicago, Illinois 60601
T: +1 312 609 7500
F: +1 312 609 5005

*Attorneys for Defendant David H. Wright*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-cr-00559-1 |
| Plaintiff, | **DEFENDANT DAVID H. WRIGHT'S SENTENCING MEMORANDUM** |
| v. | [*Filed concurrently with Supporting Exhibits; Objections to Presentence Investigation Report*] |
| DAVID H. WRIGHT, | |
| Defendant. | Hon. Stanley Blumenfeld, Jr. |
| | Hearing Date:    April 26, 2022 |
| | Hearing Time:    8:00 a.m. |

1   Defendant DAVID H. WRIGHT, by and through his counsel of record, hereby respectfully

2   submits his Sentencing Memorandum and concurrently files herewith supporting Exhibits and

3   Objections to Presentence Investigation Report.

4   Mr. Wright's Sentencing Memorandum consists of these papers, the pleadings, records and

5   files in this matter, and such evidence, argument and additional materials that may be presented at

6   Mr. Wright's sentencing hearing.

7

8   Dated: April 12, 2022                    VEDDER PRICE (CA), LLP

9

10  By: _____

11  Anthony Pacheco
    Brooke E. Conner

12  Maura L. Riley

13  Attorneys for Defendant
    David H. Wright

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2                                                                                        **Page**

3    PRELIMINARY STATEMENT.................................................................................. 1

4    FACTUAL BACKGROUND .................................................................................... 2

5        I.      BACKGROUND ....................................................................................... 2

6        II.     PERSONAL HISTORY AND CHARACTERISTICS .............................. 2

7                A.   Family Background ........................................................................ 2

                 B.   Childhood and School .................................................................... 3

8                C.   Teenage Employment.................................................................... 4

9                D.   College, Marriage, and Children.................................................... 5

10               E.   Coming Out of The Closet ............................................................ 5

11               F.   Spotless Career as A Public Servant ............................................ 7

                 G.   Diagnosis of Celiac Disease .......................................................... 8

12       III.    NATURE OF THE OFFENSE ................................................................. 9

13               A.   Troubles at the LADWP ................................................................ 9

14               B.   Paul Paradis's Outsized Influence on Mr. Wright ..................... 11

15               C.   The Illegal Agreement ................................................................ 13

16       IV.     COOPERATION EFFORTS ................................................................. 15

     ARGUMENT ........................................................................................................ 16

17       I.      THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT

18               A LOWER SENTENCE ........................................................................ 17

19       II.     THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT
                 SUPPORT A LOWER SENTENCE....................................................... 19

20               A.   Mr. Wright's Long Career as An Exemplary Public Servant .................. 20

21               B.   Mr. Wright Is A Pillar of His Family and Community ............................ 20

22               C.   Mr. Wright's Clean Record....................................................................... 22

                 D.   Need to Avoid Unwarranted Disparities Among Similar Offenders ........ 22

23               E.   Mr. Wright's Deep Remorse and Plea for Compassion............................ 23

24   CONCLUSION..................................................................................................... 24

25

26

27

28

Vedder Price (CA), LLP
Attorneys at Law
Los Angeles

VP/#55494026.6

- i -

DEFENDANT'S SENTENCING
MEMORANDUM 2:21-CR-00559-1

1

## <u>TABLE OF AUTHORITIES</u>

2

3

**Page(s)**

4

**Cases**

5

*Kimbrough v. United States,*
    552 U.S. 85 (2007) ................................................................................................. 2

6

7

*United States v. Booker,*
    543 U.S. 220 (2005) ............................................................................................. 16

8

*Beckles v. United States,*
    137 S. Ct. 886, 894 (2017) ................................................................................... 16

9

10

*Gall v. United States,*
    552 U.S. 38 (2007) ............................................................................................... 16

11

*Rita v. United States,*
    551 U.S. 338 (2007) ............................................................................................. 16

12

13

*United States v. Robertson,*
    662 F.3d 871 (7th Cir. 2011) ............................................................................... 16

14

15

*United States v. Cardenas-Juarez,*
    469 F.3d 1331 (9th Cir. 2006) ............................................................................. 16

16

17

*United States v. Gorman,*
    807 F.2d 1299 (6th Cir. 1986) ............................................................................. 18

18

*United States v. Scruggs,*
    916 F. Supp. 2d 670, 701 (N.D. Miss. 2012) ...................................................... 18

19

20

*Pepper v. United States,*
    562 U.S. 476 (2011) ....................................................................................... 17, 24

21

22

*United States v. Lauersen,*
    348 F.3d 329 (2d Cir. 2003) ................................................................................. 17

23

*United States v. Suarez-Reyes,*
    2012 U.S. Dist. LEXIS 178771 (D. Neb. Dec. 18, 2012) .............................. 17, 22

24

25

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd,* 301 F. App'x 92 (2d Cir. 2008) ...... 19

26

*United States v. Howe,*
    543 F.3d 128 (3d Cir. 2008) ................................................................................. 22

27

28

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

- ii -

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

*United States v. Rowan*,
  No. 06-321, 2007 U.S. Dist. LEXIS 2126 (E.D. Pa. Jan. 10, 2007) ....................................... 22

**Statutes**

18 U.S.C. § 666(a)(1)(B) ................................................................................................... 1, 2

18 U.S.C. § 3553(a) .................................................................................................... *passim*

18 U.S.C. § 3553(a)(1) ......................................................................................................... 19

18 U.S.C. § 3553(a)(2) ......................................................................................................... 24

U.S.S.G. § 2B1.1 .............................................................................................................. 1, 18

U.S.S.G. § 2C1.1(b)(1) .......................................................................................................... 18

U.S.S.G. § 3E1.1 ..................................................................................................................... 2

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-iii-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**<u>PRELIMINARY STATEMENT</u>**

There are compelling factual and legal grounds for the Court to impose a sentence well below the applicable United States Sentencing Guidelines ("Sentencing Guidelines") range, which would result in an unfair and unjust sentence if applied in this case.

First, the Guidelines' offense level overstates the seriousness of Mr. Wright's offense. Mr. Wright pled guilty to a one-count Information to bribery pursuant to 18 U.S.C. § 666(a)(1)(B). Although this is a serious offense for which Mr. Wright is extraordinarily embarrassed and remorseful, the context of the bribe must be considered so that the Court can impose a sentence that is "sufficient, but not greater than necessary" pursuant to 18 U.S.C. § 3553(a). In this matter, Mr. Wright received meals, travel, and event tickets from Paul Paradis, but he did not receive any of the proposed proceeds of his job offer from Mr. Paradis, including the offered $1 million salary, the luxury car, or the signing bonus that he and Mr. Paradis agreed upon as part of the bribery scheme. The "bribe amount" (the loss) therefore greatly overstates the seriousness of the offense. This warrants a substantial downward departure under U.S.S.G. § 2B1.1, App. Note 21(C) and a variance under Title 18 U.S.C. § 3553(a).

Second, Mr. Wright's crime was not consistent with his character. When Mr. Wright went to work at the Los Angeles Department of Water and Power ("LADWP") and was quickly promoted to several high-level managerial positions, he ended up in a situation that was way over his head. The instant charges are an aberration in an otherwise long, successful career free of impropriety. Prior to being named General Manager of the LADWP, Mr. Wright had worked for nearly three decades in managerial positions in the public sector. He had always been an excellent manager, and, prior to the instant matter, his personal and professional record was spotless. As reflected in the letters of support submitted on his behalf, Mr. Wright is a loving and caring man at work and at home, where he provides critical emotional support to his partner, ex-wife, children, and grandchildren. Mr. Wright has fully accepted responsibility and has cooperated fully with the government during the course of its investigation. He has no criminal history—indeed, Mr. Wright has no prior negative interactions with law enforcement whatsoever in his 62 years—and has otherwise led an exemplary life, marked by kindness, generosity, and hard work.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

For these reasons, which are discussed in greater detail below, Mr. Wright respectfully asks that the Court grant his requests for downward departures under the Guidelines and variances under 18 U.S.C. § 3553(a) to a sentence less than 24 months that is "sufficient, but not greater than necessary" to accomplish the sentencing goals in this case. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)).

## FACTUAL BACKGROUND

### I.     BACKGROUND

Mr. Wright is a 62-year-old man who, until February 2017, spent his career as a model public servant. His criminal history is limited to his participation in the instant offense. Mr. Wright pled guilty to a single count of bribery in violation of 18 U.S.C. § 666(a)(1)(B). ECF 7. The charge arises from a bribery scheme orchestrated by Mr. Paradis while Mr. Wright was the General Manager of the Los Angeles Department of Water and Power. PIR ¶¶ 10-14. Mr. Wright pleaded guilty pursuant to a written plea agreement, ECF 7, and completely accepts responsibility.

In the plea agreement, the parties agreed to applicable Sentencing Guidelines factors that result in an adjusted offense level of 33 after applying a three-level reduction for Mr. Wright's acceptance of responsibility. ECF 7. The United States Probation Office found no basis to apply any sentencing enhancement. PIR ¶ 73. The resulting advisory Guideline range for an offense level 33 with criminal history category I exceeds the statutorily authorized maximum sentence, which is 120 months' imprisonment. PIR ¶ 171; U.S.S.G. § 5G1.1(a). The plea agreement permits Mr. Wright to argue for applicable departures and also for downward adjustments under Section 3553(a). ECF 7 at 6. **In fact, based on the strength of the factors in mitigation, the probation officer recommended a downward variance from the advisory range to 72 months.** ECF 35 at 1.

### II.     PERSONAL HISTORY AND CHARACTERISTICS

#### A.     Family Background

David Wright was born in 1960 to Alan and Sheila Wright. PIR ¶ 88. Mr. Wright's parents grew up in Birmingham, England and came to the United States in the mid-1950s. Once in the United States, Alan earned a degree in mechanical engineering at California State University, Long

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-2-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

Beach, and then worked for Beckman Instruments as an engineer in the City of Fullerton.  As a young woman, Sheila worked as a bank teller.  Mr. Wright recalls that his mother was quite well-read and instilled in him a love of reading.  PIR ¶ 98.  Sheila died at the age of 74, and Alan passed away in 2016 at the age of 86.  PIR ¶ 88.

Mr. Wright has two siblings.  His brother, Martin John Wright, lives in Anaheim Hills, California.  Mr. Wright's sister, Susan Marjorie Caballero, lives in Yorba Linda, California with her husband and children.  PIR ¶ 91.

**B.**     **Childhood and School**

When Mr. Wright began elementary school in the City of Orange, he quickly learned he was different than his peers:

> I started kindergarten and discovered I was no good at the sports that seemed to come naturally to most of the boys.  Instead of rough and tumble games, I liked painting and drawing.  I loved to color and was happy playing indoor imaginative games.

> Much later, my mother told me that she and my dad were already wondering if I was gay when I was only 3 years old.[1]

Money was tight during Mr. Wright's elementary school years.  Although there was always food on the table and a roof over his head, unlike most of his classmates, Mr. Wright wore his jeans and tennis shoes until they were completely worn out.[2]  In middle school, he was called horrible names nearly every day by his classmates.  *Id.*  Mr. Wright, who was overweight during much of his childhood and adolescence, remembers keeping quiet in class to hide his intelligence.  PIR ¶ 100.

He took refuge in school and extracurriculars, where he excelled.  In middle school, Mr. Wright took up the saxophone and played in the band and the marching band from the seventh through the twelfth grade.  PIR ¶ 102.  Mr. Wright's childhood friend, Daniel Lelchuk ("Lelchuk").  Lelchuk, who serves as a Senior Vice President for a large auto parts distributor, describes meeting Mr. Wright when they were both selected for advanced classes in fifth grade.  D. Lelchuk Ltr., Ex. 2.  Throughout middle and high school, Mr. Wright, Mr. Lelchuk, and their friends were "high

---

[1] The language from Mr. Wright quoted or referenced herein arises from comments Mr. Wright shared with the probation office.

[2] *See supra*, footnote 1.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-3-                    DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

achievers, who also participated in various extra-curriculars such as band, sports, scouting" but "Dave was always the friend I could talk to."  *Id.*  Villa Park High School offered a strong curriculum and Mr. Wright generally enjoyed all his subjects.  In the twelfth grade, he had an excellent English teacher who introduced him and the class to the literary classics.  Mr. Wright recalls that he began reading Dickens, Steinbeck, and Kurt Vonnegut, and when time permits, he still reads them to this day.[3]  Years later, when Mr. Wright was 45, he wrote letters to his twelfth-grade English teacher and his chemistry teacher in which he expressed his gratitude for all the help they had given him.[4]

### C.  Teenage Employment

Although the Wrights' financial situation improved gradually as Mr. Wright moved into adolescence, money was still tight, and he gladly took whatever jobs came his way.  PIR ¶ 103.  Throughout his teens, he worked four days a week at a hair salon sweeping up and washing the floors and fixtures, then at a soft-serve ice cream shop, and later at an art store.  PIR ¶ 103.  He was a quick learner and was recognized as an excellent employee.

Mr. Wright's father Alan also taught Mr. Wright home construction, which has been a part of Mr. Wright's life ever since.  PIR ¶ 102.  Mr. Wright recalls that by the age of 12, he could hang wallpaper without help.  While still a teenager, after helping his father construct several patio covers, Mr. Wright began designing his own.  *Id.*  He enjoyed the process of developing a design and getting it down on paper and, over the years, has remodeled parts of numerous houses.  During college, Mr. Wright began fixing up houses, starting in an older neighborhood in Anaheim.  PIR ¶ 104.  He would redesign the yards and would update and improve various features in the homes.  Based on the expertise that he began developing in his youth and cultivated into adulthood, Mr. Wright won a Neighborhood Beautification Award when he was 38.  In total, he has improved about a dozen homes in Riverside.[5]

---

[3] *See supra*, footnote 1.
[4] *See supra*, footnote 1.
[5] *See supra*, footnote 1.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-4-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### D.    College, Marriage, and Children

After high school, Mr. Wright attended California State University, Fullerton ("CSUF"). PIR ¶ 104.  He majored in accounting and worked at various restaurants to put himself through school.  *Id.*  Mr. Wright earned his Bachelor's Degree in Business in 1982, then went directly into an MBA program with an emphasis on accounting at his father's encouragement.  PIR ¶ 105. Mr. Wright continued working evenings as a server until he completed his MBA in 1985.  He recalls that during his years of restaurant service, he made a conscious choice to try and overcome the insecurities that had arisen due to the constant bullying he endured throughout elementary and middle school.[6]  Mr. Wright worked hard to develop his customer service skills, which were to stand him in good stead as he began his professional career.

It was at one of these restaurant jobs where he met his future wife and the mother of his children, Carolyn Raney ("Carolyn").  In her letter to the Court, Carolyn writes "I had never met anyone more kind, caring and generous than Dave.  I knew that he would be in my life for a long time." C. Wright Ltr., Ex. 3.  They soon became friends, then a couple, and were married in June of 1980 while still in college.

During his 13-year marriage to Carolyn, Mr. Wright was extremely busy with work, school, and parenting.  PIR ¶ 107.  Around the time he was in graduate school, he and Carolyn had three sons in quick succession.  He built a close relationship with his sons, which he maintains to this day.  The three boys all followed the example set by their father and pursued careers in public service as adults.  Evan is a member of the Riverside Police Department SWAT team; Jeff works for the City of Riverside Public Utilities; and Spencer works as an engineer at the LADWP.  PIR ¶ 95.

### E.    Coming Out of The Closet

For at least a decade, Mr. Wright and Carolyn were very much in love and worked well together.  He remembers, "for quite a while, I completely buried any thoughts about being gay."[7] Due to his fear of intense societal disapproval, Mr. Wright had spent decades denying his true

---

[6] *See supra*, footnote 1.

[7] *See supra*, footnote 1.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-5-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

nature as a gay man, but as he moved into his early thirties, he realized that he had to face his homosexuality openly. Mr. Wright spoke frankly to Carolyn about his orientation, and they agreed to separate. Mr. Wright was 33 and Carolyn was 35. Mr. Wright recalls, "I felt terrible about breaking up our nuclear family, but knew I had to do it."

Although their separation was amicable, Mr. Wright was devastated by the fact that his marriage was over. He was determined to continue caring for his family emotionally and financially. He moved back home with his parents in Anaheim Hills and continued to spend time with his children daily. He spent the weekends with the kids at Carolyn's house while she stayed with nearby relatives. In his letter to the Court, Evan Wright writes:

> During my childhood, my dad taught me and showed me some very important things that have helped me and shaped me during my life. My dad taught me not to judge someone because of their race, gender, sexual preference, etc. He didn't have to tell me not to do this, he showed me through his actions and this has helped me tremendously, especially as a police officer. My dad also taught and showed me what it's like to have a strong work ethic and provide for my family. E. Wright Ltr., Ex. 4.

Carolyn remembers "[a]lthough we were separated, Dave never stopped caring for me and always made sure that I had everything I needed to care for our children and that the children and I had a good place to live." C. Wright Ltr., Ex. 2. Mr. Wright suggested that since Carolyn enjoyed working with kids, she should consider going back to school to become a teacher. Indeed, Mr. Wright financially supported Carolyn while she went to night school to earn her bachelor's degree from CSUSB and receive her teaching credentials. C. Wright Ltr., Ex. 3. When Mr. Wright accepted a job in San Diego, although he and Carolyn had been separated for five years, they got along so well that she decided to move to San Diego so that Mr. Wright would still be able to see the children without driving for two or three hours in either direction. At that point, Carolyn had not yet started teaching, and Mr. Wright was providing complete financial support for her and the kids.

Mr. Wright has been in a stable, committed relationship with his partner, Vincent J. Price ("Vincent"), for the past 18 years. PIR ¶ 93. Vincent works for the City of Riverside as a Principal

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-6-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

IT Analyst.  He performs internal audits and does compliance work, ensuring, among other things, that all licenses are up to date.  In his letter, Vincent writes:

> As a veteran having served over 10 years in the Air Force, we were always taught to have a high level of discipline and to be honorable at all times; I believe David has those qualities despite not having served in the armed forces.  I think he has a high regard for being a father, and has always made sure to try and instill those same qualities in his children."  V. Price Ltr., Ex. 6.

## F.   Spotless Career as A Public Servant

Mr. Wright's first job after graduating with his MBA was at a top-rated national accounting firm in San Bernardino, where he served as an auditor completing government audits at various agencies and local communities.  Mr. Wright earned glowing reviews.  After a year, he was promoted to Senior Auditor.

Soon thereafter, Mr. Wright began his career in public utilities, which has taken him to different agencies and different municipalities.  He was very good at his job and parlayed that into high-level positions that rewarded his hard work.  PIR ¶ 110.  Mr. Wright found utilities very interesting: "I already knew something about building houses.  Now I was learning about the greater infrastructure that brings power and water to our homes."[8]  However, these positions were stressful and took a toll on Mr. Wright's physical and emotional health.  PIR ¶ 110.

His first job in the public sector was an Internal Auditor job with the City of Riverside.  After six months on the job, he was promoted to City Controller.  His new duties included managing general accounting, overseeing the annual audit and accounts payable and receivable, and analyzing the cost of providing city services to residents.  Mr. Wright recalls, "[b]ecause I had a strong financial and customer service background, I was assigned to develop individual, cost-based contracts with our large customers.  I eventually negotiated about 25 to 30 multi-year contracts, with some approaching $15M."[9]

In 1993, Mr. Wright accepted a job as CFO for Riverside Public Utilities ("RPU").  PIR ¶ 152.  He worked there for 5 years, and, after a brief stint as the CFO of the San Diego Water

---

[8] *See supra*, footnote 1.
[9] *See supra*, footnote 1.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-7-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

1    Authority, returned to RPU for another 15 years when RPU had offered him the Deputy General
2    Manager position.  Mr. Wright was thrilled, but his new position was a huge responsibility.  PIR
3    ¶ 151.  As Deputy General Manager, he handled the contracts for the top 10 percent of the
4    customers.  That meant Mr. Wright needed to be a jack-of-all-trades—he handled the marketing,
5    he handled accounting analysis, and he had to develop a solid working knowledge of the technology
6    required to transmit water and power.  *Id.*

7        Yet, Mr. Wright rose to the challenge.  Under Mr. Wright's stewardship, RPU had the
8    highest customer satisfaction rating of any public utilities company in America.  His colleagues,
9    like Michael Bacich, who has served as an executive in the utilities industry for the past 22 years,
10   describe Mr. Wright as a "visionary," "unparalleled as a department head in the City of Riverside's
11   long history." M. Bacich Ltr., Ex. 7.  "Under his leadership, the City of Riverside was given more
12   recognition in terms of awards and financial benefit (as in the case of the 2009 American Recovery
13   and Reinvestment Act) than at any time in the history of the city…  His work brought local, state,
14   national, and international acclaim to the City of Riverside." *Id.*

15       Ultimately, Mr. Wright's hard work and skill continued to send him up the corporate ladder,
16   to bigger and bigger utilities, taking larger and larger roles.  He was hired by the Las Vegas Valley
17   Water District as the CFO and then the major league—LADWP wanted him to be its General
18   Manager.

19       **G.    Diagnosis of Celiac Disease**

20       Even while he was achieving success at work, Mr. Wright was suffering privately.  Since
21   about 2007, Mr. Wright had been suffering alarming physical symptoms, the worst of which were
22   perpetual fatigue and persistent diarrhea, sometimes as much as 5 to 10 times a day.  PIR ¶ 131.
23   Mr. Wright underwent a medical workup that revealed he had a serious iron deficiency, which,
24   according to his doctor, had rendered him anemic.  *Id.*  For the next 10 years, Mr. Wright cycled
25   through the same pattern over and over—his doctor would prescribe iron supplements,
26   Mr. Wright's symptoms would subside after taking them for a month or two, his doctors would tell
27   him to stop taking the iron supplements to avoid negative side effects, and then his symptoms
28   (fatigue and diarrhea) would flare again.  *Id.*

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-8-                     DEFENDANT'S SENTENCING MEMORANDUM
                       2:21-CR-00559-1

Approximately 10 years later, while struggling with the pressures of his new high-level management position at the LADWP, Mr. Wright's symptoms flared frighteningly. PIR ¶ 132. He experienced extreme fatigue and near constant diarrhea. This period coincided with Mr. Wright attempting and failing to adjust successfully to the pressures and obstacles he faced at the LADWP. A medical workup performed in October of 2017 revealed that his iron levels were once again very low. This time, however, Mr. Wright's doctors decided to biopsy his small intestine. The results indicated that he was suffering from celiac disease, an autoimmune disorder. PIR ¶ 132. It had been tormenting him, untreated, for more than a decade.

It was at this time in the middle of 2017, while struggling with his debilitating symptoms and prior to his celiac disease diagnosis, that he made the self-destructive decision to enter into the illegal agreement with Mr. Paradis. Mr. Wright is fully aware that the fact that he was operating at a significant handicap during this period does not and cannot excuse his illegal conduct. It does, however, help to explain why this well-meaning, pro-social individual made a series of bad decisions (in his late fifties) during his years at the LADWP.

III.   **NATURE OF THE OFFENSE**

   A.   **Troubles at the LADWP**

Mr. Wright started work at the LADWP on February 15, 2015. Despite his sparkling resume as a public utilities manager, it quickly became apparent that Mr. Wright was out of his depth. The LADWP is the largest municipal utility in the United States. PIR ¶ 10. It employs approximately 10,000 people and has an annual budget of around $6 billion. PIR ¶ 111. By way of comparison, the LADWP is approximately 20 times larger than Mr. Wright's previous long-term employer, RPU. Yet the LADWP appeared to be perpetually understaffed. Mr. Wright recalls that when he first started working at the LADWP, frustrated customers who called to complain were often kept on hold for up to an hour.[10]

It only took a few weeks on the job for Mr. Wright to discover that the LADWP had myriad problems, perhaps the most obvious of which was its billing problem. PIR ¶ 111. Eighteen months prior to Mr. Wright's starting date, the LADWP had signed a $70 million contract with

---

[10] *See supra*, footnote 1.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-9-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

PricewaterhouseCoopers ("PwC") that required the accounting firm to implement software that would repair and streamline the LADWP's billing processes, while also providing accurate billing to its customers.  At that time, the billing system was in such disrepair that billing mistakes amounting to $1 billion had occurred in recent years.  When PwC failed to provide the curative measures to the billing system that it was under contract to deliver, approximately one month before Mr. Wright was hired, the Los Angeles City Attorney's Office hired Mr. Paradis, a high-powered lawyer with expertise in class action lawsuits related to IT issues, to try to determine the amount of the damages that PwC was responsible for.  PIR ¶ 12.  This, in turn, required Mr. Paradis to spend a great deal of time at the LADWP in order to have hands-on access to the billing system.

Mr. Wright has described how his approach at his previous jobs had always been to be a consensus builder.  PIR ¶ 113.  This approach had worked well for him, and when Mr. Wright came on board at the LADWP, his intention was to do the same.  He discovered, however, that the depth of the divisions within the various departments at the LADWP made this approach unworkable.  *Id.*  Mr. Wright felt stymied at every turn and was unable to find a guide or mentor among the high-ranking, highly political LADWP employees.

Mr. Wright was also separated from his support network for the first time in his life.  The commute from Mr. Wright's home in Riverside to the main LADWP campus on Hope Street was over 100 miles round trip and was very difficult unless he left Riverside at 4:30 a.m. to beat the bulk of the traffic.  So, Mr. Wright rented an apartment in downtown Los Angeles near the LADWP campus.  It was extremely lonely living alone in the downtown area.  He was not making new friends, and his new work pressures and long hours were daunting.  For a while, one of Mr. Wright's sons moved in with him in Los Angeles, primarily to keep him company.  PIR ¶ 112.  Shortly thereafter, Mr. Wright decided to move back to Riverside and suffer the grueling commute.  Mr. Wright's unsettled living situation, combined with what proved to be a very difficult work situation at the LADWP, triggered a fresh attack of the deep-seated feelings of not fitting in, insecurity, and low self-esteem that had plagued him at intervals throughout his life.  PIR ¶ 114.

Moreover, Mr. Wright felt tokenized as an out, gay man.  The Deputy Mayor of Infrastructure openly discussed the fact that Mr. Wright is gay with Mr. Wright prior to

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-10-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

1   Mr. Wright's promotion to General Manager of LADWP. *Id.* Mr. Wright understood that the

2   Mayor valued diversity, but his low self-esteem made him question whether the primary reason he

3   was being promoted was because he was gay, and not because he possessed the skills to succeed in

4   his position. These feelings were reinforced in June 2017 at the Mayor's LGBT Pride Month

5   Garden Party, where Mayor Garcetti announced to the crowd of about 600 that they could now all

6   pay their utility bills to the "gay general manager of LADWP." *Id.* Mr. Wright recalls that, "rather

7   than making me feel more confident, it reinforced my feelings that I was only in this position to

8   meet an informal quota, rather than because I was qualified for the position." *Id.*

9       Viewing Mr. Wright's situation objectively, it appears that Mr. Wright had gotten in way

10   over his head politically at the LADWP and should have resigned his post, rather than accepting a

11   series of promotions that only made the situation worse. Mr. Wright unfortunately did not follow

12   his instincts, which were telling him to put in his resignation. Instead, he did what he had all his

13   life—he tried very hard to succeed. By 2017, he had been promoted to General Manager.

14       **B.**    **Paul Paradis's Outsized Influence on Mr. Wright**

15       Mr. Paradis entered Mr. Wright's life when Mr. Wright was dealing with the stress of his

16   job, the loneliness of living alone in Los Angeles, the reemergence of physical health problems, a

17   resurgence of emotional issues that were never properly dealt with in his youth, and grief over his

18   father's death. Mr. Wright's father Alan died on October 1, 2016. PIR ¶ 88. Mr. Wright had

19   always been close to his father, but after his mother's death a decade prior, Mr. Wright and Alan's

20   relationship had deepened markedly. In effect, Mr. Wright and his siblings were Alan's best friends

21   during his final years. PIR ¶ 89. Naturally, Mr. Wright felt a deep void in his life after his father

22   died. They had been in the habit of talking on the phone frequently and getting together on many

23   weekends. Mr. Wright had agreed to serve as executor of Alan's estate, and for the first six months

24   after his death, in addition to dealing with the constant demands of his LADWP job, he was obliged

25   to spend a considerable amount of time working with the entities and individuals named in the will.

26   Mr. Wright believes that the fact that he was executor of Alan's will kept his father's death fresh

27   in his mind and made it all the more painful. *Id.*

28

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-11-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

At the same time in 2016, Mr. Paradis had been awarded two contracts retaining him to repair the LADWP billing system.  PIR ¶¶ 12-13.  During the second half of 2016, Mr. Paradis occupied an office near Mr. Wright's at the downtown LADWP campus.  Given the nature of their duties, the two men interacted on a frequent basis.  Once Mr. Paradis learned that Mr. Wright was very depressed over his father's death, he went out of his way to express his sympathy on numerous occasions, which endeared him to Mr. Wright as he was grieving his father.

Mr. Wright perceived Mr. Paradis to be an extremely talented individual.[11]  Mr. Paradis was unusual in that he not only possessed first-rate legal expertise, but he was also quite well-versed in the general area of information technology.  These two qualities in one individual made him an attractive candidate for jobs requiring a strong working knowledge in both areas.  In addition, Mr. Paradis possessed substantial charisma, yet appeared to be somewhat of a loner from Mr. Wright's perspective.  When Mr. Wright started interacting with Mr. Paradis, he was struck by the fact that this well-known lawyer seemed to be effective at implementing positive changes in the LADWP billing system.  Mr. Wright recalls that over the course of approximately 24 months, Mr. Paradis's team identified and implemented around 1,000 "fixes," which slowly improved the overall functionality of the system.[12]

Most importantly, however, was the fact that after Mr. Wright expressed his frustration over his inability to build any kind of consensus among the key figures working at the LADWP, Mr. Paradis, beginning in early 2017, took Mr. Wright under his wing and began serving as a kind of mentor.  Recognizing that Mr. Wright's abilities, especially in technical areas, far exceeded his own, Mr. Paradis embarked upon a program of subtle and not-so-subtle flattery.  This occurred during an ongoing conversation between the two men that began in early 2017 and continued for the next few years.  A key prong in Mr. Paradis's strategy to manipulate Mr. Wright was to compare Mr. Wright favorably to the other key LADWP employees, whom he tended to dismiss with pejorative comments.  Mr. Wright recalls:

[11] *See supra* footnote 1.
[12] *See supra* footnote 1.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES
VP/#55494026.6
-12-
DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

I now realize that…   Mr. Paradis had ulterior motives and was working hard to butter me up.  He would frequently say things like, "You're tremendous.  Only you see the common-sense answers that everyone else here in billing is missing.  They're all a bunch of morons, Mr. Wright.  You're the only one of the whole lot with any brains."[13]

Thus, Mr. Wright was already well-disposed toward Mr. Paradis for several reasons.  First, Mr. Wright perceived Mr. Paradis as being a highly competent individual.  This was borne out by the fact that Mr. Paradis's team was succeeding to some degree in improving the LADWP's broken billing system.   Second, Mr. Paradis's consistent praise of Mr. Wright's abilities and overall competence was very reassuring to Mr. Wright, given that he felt perennially insecure concerning his position at the LADWP.  Mr. Wright viewed Mr. Paradis as both a professional mentor and a replacement father figure who truly cared about him and had his best interests at heart, just like a real father would.

### C.   The Illegal Agreement

During late 2016 and early 2017, Mr. Wright and Mr. Paradis developed what Mr. Wright viewed as a close personal friendship, in which they were in frequent communication in person and electronically.  PIR ¶ 14.   Mr. Paradis leveraged this friendship to bring up the prospect of performing additional services for the LADWP.  He could not provide future remediation services for the LADWP through his law firm due to state bar rules prohibiting law firms from providing non-legal services.  PIR ¶ 15.   Instead, Mr. Paradis said that he would form a new company, Aventador, that could provide future remediation and other services to the LADWP under a separate contract.  *Id.*  Mr. Paradis planned to seek a contract worth approximately $30 million.  *Id.*

As part of his scheme to convince Mr. Wright to lobby for him to be awarded the $30 million LADWP contract, Mr. Paradis and his wife began wining and dining Mr. Wright at various exclusive restaurants in Southern California.  Mr. Paradis also gave Mr. Wright gifts, such as Dodgers' tickets and tickets to a Broadway play.  The fact that Mr. Paradis consistently asked

---

[13] *See supra* footnote 1.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-13-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

Mr. Wright out to dinner reaffirmed in Mr. Wright's mind the notion that Mr. Paradis really cared about him and really was his friend.[14]

Then, on February 10, 2017, Mr. Paradis offered Mr. Wright a job:  Mr. Paradis would name him Aventador's Chief Executive Officer once he retired from the LADWP, with benefits including an annual salary of $1 million, a $600,000 signing bonus, and a luxury company car.  PIR ¶ 17.  The fact that Mr. Paradis told Mr. Wright that an excellent job with a handsome salary awaited him a few years down the road reaffirmed Mr. Wright's belief that Mr. Paradis viewed him as a worthy individual.  Mr. Wright recalls Mr. Paradis's flattery: "[w]hen I asked him why he would not be CEO himself, [Mr. Paradis] told me, 'The answer is simple.  You'll be so much better at it than I would be.'"[15]

Implied in all of this, however, was the sticking point.  For Mr. Paradis's plans regarding Aventador to come to fruition, which in theory meant Mr. Wright would ultimately be hired as CEO, it was first necessary that Mr. Paradis be awarded the $30 million LADWP contract.  Given this scenario, Mr. Wright worked to ensure Mr. Paradis received the contract by advocating in favor of the Aventador proposal to the LADWP Board members who were responsible for approving the contract.  Mr. Wright knew this agreement was illegal, and he and Mr. Paradis discussed the need to keep their agreement confidential.  On June 6, 2017, Mr. Wright urged the LADWP Board to approve the contract.  PIR ¶¶ 32-33.  The Board voted unanimously to award Aventador a three-year, $30 million no-bid contract.  PIR ¶ 34.  Mr. Wright did not disclose to the members of the LADWP Board the perks and offer of employment by Mr. Paradis.

It must be noted that although Mr. Wright was interested in the possibility that he would ultimately serve as CEO at Aventador, he was never entirely convinced that Mr. Paradis's plans would come to fruition.  Mr. Wright's skepticism was such that, in October of 2018, as he was becoming increasingly disgruntled at the LADWP, he applied for a management-level job at another California utility agency.[16]

---

[14] *See supra*, footnote 1.
[15] *See supra*, footnote 1.
[16] *See supra*, footnote 1.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

-14-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

VP/#55494026.6

However, during the remainder of 2017 up until early 2019, Mr. Wright continued to collaborate with Mr. Paradis to build and market Aventador, and even made plans to create a new company to replace Aventador when Aventador became subject to bad publicity. PIR ¶ 37. In 2019, the LADWP Board voted to terminate the Aventador contract, but agreed to retain the company's services if Mr. Paradis sold his stake in the company and disavowed his interest in the company, which he purported to do. PIR ¶ 42. Mr. Wright began to fear his relationship with Mr. Paradis and their Aventador plans would be discovered. PIR ¶ 43. Mr. Wright got rid of incriminating documents at his office, and asked Mr. Paradis to delete data from the "burner" cell phone and Aventador laptop he had acquired for Mr. Wright. *Id.*

Mr. Wright's relationship with Mr. Paradis led to Mr. Wright losing his moral compass for the first and only time in his 27 years of working in the public sector. Mr. Wright is fully and painfully aware that the fact that Mr. Paradis used and manipulated him in order to get him to lobby for Mr. Paradis to receive the $30 million LADWP contract does not absolve him of responsibility for the criminal conduct to which he has pleaded guilty. Mr. Wright's remorse and contrition for having broken the law is profound. He knows he will regret this mistake for the rest of his life.

## IV.   COOPERATION EFFORTS

Mr. Wright's cooperation with the Government began very soon after his arrest in June 2019. Initially, Mr. Wright was in a state of shock and, that June, he falsely stated that he did not have any financial or business interest in Aventador during an interview with the FBI and the United States Attorney's Office. Subsequently, Mr. Wright calmed down and was transparent and candid in his answers to all the Government's questions.

From that point on, Mr. Wright fully cooperated with the Government during its investigation. He realized that his conduct fell far short of what he expected of himself and tried to assist the Government to understand the extent of the misconduct, all in an effort to try to repent for his misdeeds. Because Mr. Wright had held various high-ranking positions at the LADWP, culminating in General Manager, he knew a great many key people in house at the LADWP. He also knew and interacted with most of the Board members as well as the Mayor and many of his staff members, not to mention Mr. Paradis and people associated with Mr. Paradis. In an early

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-15-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

1    proffer session, on the strength of his potential cooperation, the Government made the decision to

2    have him work undercover wearing a wire as a confidential informant.  Based on the Government's

3    directions, Mr. Wright recorded numerous phone calls and meetings with a large number of

4    individuals who are thought to be persons of interest in the Government's investigation.  During

5    his undercover work, Mr. Wright responded promptly to each and every request made by the

6    Government.  He got back to them quickly with summaries after every recorded meeting and phone

7    call.  He regularly suggested ways in which he could aid the investigation.

8         The Government did not offer Mr. Wright a § 5K1.1 downward departure for his

9    cooperation.  He nonetheless believed that it would be important as part of his own repentance and

10   remorse for his misconduct.  He respectfully requests that the Court consider his cooperation.

11                                    **ARGUMENT**

12        First and foremost, Mr. Wright accepts responsibility.  Notwithstanding Mr. Wright's guilt,

13   the facts and circumstances of this case support a downward variance from the applicable

14   Guidelines range.  After *United States v. Booker*, 543 U.S. 220, 245 (2005), the Sentencing

15   Guidelines are purely advisory.  Moreover, the Supreme Court has clearly directed that the

16   Sentencing Guidelines "continue to guide district courts in exercising their discretion by serving as

17   the framework for sentencing, but they do not constrain that discretion." *Beckles v. United States*,

18   137 S. Ct. 886, 894 (2017) (citations and internal quotation marks omitted).

19        The sentencing court cannot favor a guideline sentence by relying exclusively on the

20   Sentencing Guidelines and "must make an individualized assessment based on the facts presented"

21   *and* the factors set forth in 18 U.S.C. § 3553(a).  *Gall v. United States*, 552 U.S. 38, 49 (2007); *Rita*

22   *v. United States*, 551 U.S. 338, 350–51 (2007).  The importance of *Booker* is "sentencing judges

23   have broad discretion to impose a non-guideline sentence by weighing the factors under § 3553(a)."

24   *United States v. Robertson*, 662 F.3d 871, 875 (7th Cir. 2011); *see also United States v. Cardenas-*

25   *Juarez*, 469 F.3d 1331, 1334 (9th Cir. 2006) (holding that district courts "have the discretion to

26   impose non-Guidelines sentences.").

27        The instant case exemplifies why the Supreme Court rejected mandatory and mechanical

28   application of the Sentencing Guidelines and restored district courts' discretion "to consider every

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-16-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (2011).  Indeed, the facts and circumstances of Mr. Wright's case support a downward variance from the Guidelines range for a number of reasons, including (1) the minimal tangible benefits Mr. Wright received; (2) Mr. Wright's long career as a model public servant; and (3) Mr. Wright's many positive personal characteristics and prior clean record.

## I.     THE NATURE AND CIRCUMSTANCES OF THE OFFENSE SUPPORT A LOWER SENTENCE

Due to the complexity of financial crime cases, courts regularly consider whether the amount of Guidelines loss overstates the defendant's culpability, warranting a downward departure. *See, e.g., United States v. Lauersen*, 348 F.3d 329, 343–44 (2d Cir. 2003) (holding that where multiple adjustments result in very high offense level that substantially overstates seriousness of offense, district court may depart downward); *United States v. Suarez-Reyes*, 2012 U.S. Dist. LEXIS 178771, at *18, *21 (D. Neb. Dec. 18, 2012) (finding application of a 14-level loss enhancement would "exaggerate [defendant's] culpability and would not be an accurate measure of his blameworthiness," and applying a downward variance).

In this case, taking these factors into consideration, Mr. Wright respectfully submits that the Court should grant a downward variance.  This was a serious offense and nothing in this sentencing memorandum or any of the papers filed on behalf of Mr. Wright in connection with sentencing is intended to suggest otherwise.  Nevertheless, Mr. Wright did not actually receive significant benefits in exchange for his assistance in securing the approval of the Aventador contract by the LADWP Board through his public support for the proposal.  Nor was it ever certain that Mr. Wright would receive significant benefits in exchange for his support.  The benefits that were promised to Mr. Wright in connection with a future role at Aventador and that are driving the Sentencing Guidelines in this case were going to be provided at an uncertain time that was several years in the future.  Whether or not the benefits would actually occur was far from guaranteed, and the timing was always vague.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-17-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

1    While Section 666(a)(1)(B) bribery applies to "anything of value," this case is an outlier in

2    that most bribery cases involve transactions more material than the mere promise of employment,

3    without any actual payment received. *See United States v. Gorman*, 807 F.2d 1299 (6th Cir. 1986)

4    ("thing of value" in bribery case was the promise of future employment as well as loans received

5    by a federal prosecutor who was in significant financial distress and took a series of actions to

6    demand payment in exchange for ending an investigation); *United States v. Scruggs*, 916 F. Supp.

7    2d 670, 701 (N.D. Miss. 2012) ("thing of value" was defendant's assistance in securing a potential

8    federal judgeship in exchange for a favorable ruling in pending litigation).

9    Although Mr. Wright was promised a high salary and company car when he became CEO

10   of Aventador, what he ultimately received from Mr. Paradis amounted to isolated dinners and other

11   entertainment, such as sporting event or concert tickets, that came at a time when Mr. Wright felt

12   he had a close personal friendship with Mr. Paradis. There were no cash payments or substantial

13   gifts given to Mr. Wright in exchange for the assistance he provided Mr. Paradis.

14   In this respect, the Guidelines loss suggests a magnitude of harm from the offense that is

15   not actually present. The PIR used the value of the promised salary and signing bonus ($1.6

16   million) as the number for the bribe payment—not the full value of the unknown benefit received

17   in exchange for the bribe—in applying a 16-level increase. Even then, the PIR's use of the

18   Guidelines figure increases the specific offense characteristic under U.S.S.G. § 2C1.1(b)(1) and

19   U.S.S.G. § 2B1.1(b)(1)(I) by 16 levels, resulting in the addition of more than 100 months to the

20   range of imprisonment in the Sentencing Table. For these reasons, the offense level substantially

21   overstates the seriousness of the offense, and a downward departure and/or variance is necessary.

22   *See* U.S.S.G. § 2B1.1, App. Note 21(C). **In fact, probation's letter to the Court recommends a**

23   **downward variance, in part because the amount is overstated:**

24   > **The Probation Officer notes that while Wright received perks**
     > **like meals, travel, and event tickets from his co-participant, he**
25   > **did not receive the proposed job and $1,000,000 salary, the**
     > **luxury car, or the signing bonus that he and the co-participant**
26   > **agreed on as part of the bribery scheme.**

27   ECF 35 at 6.

28

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-18-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

For all of these reasons, Mr. Wright respectfully moves the Court for a substantial downward variance from the applicable Guidelines range under 18 U.S.C. § 3553(a)(1) because the offense level under that guideline substantially overstates the seriousness of the offense.

## II.   THE HISTORY AND CHARACTERISTICS OF THE DEFENDANT SUPPORT A LOWER SENTENCE

The history of Mr. Wright and his family is detailed in the factual background section above.  The obstacles Mr. Wright has overcome and the good he has done demonstrate Mr. Wright is an upstanding man who was dealing with multiple issues at the time of the instant offense.  This offense is a jarring anomaly in Mr. Wright's otherwise remarkable life.  Under 18 U.S.C. § 3553(a), courts should consider these individual circumstances when considering the sentencing factors, including (1) the nature of the offense and history and characteristics of the defendant; (2) the purpose of sentencing; (3) the kinds of sentences available; (4) the Sentencing Guidelines; (5) the policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted disparities among similar offenders; and (7) the need to provide restitution to any victims of the offense.[17]

One court aptly summarized the importance of the consideration of a defendant's history and characteristics as part of the analysis under Section 3553(a):

> But, surely, if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance.  This elementary principle of weighing the good with the bad, which is common to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, "the history and characteristics of the defendant."

*United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006), *aff'd,* 301 F. App'x 92 (2d Cir. 2008).  Mr. Wright's educational and employment record, in combination with his mental and physical health history and lack of a criminal history, are relevant mitigating factors that are not considered or may not be adequately taken into account by the Guidelines and therefore, in the

---

[17] Restitution is not an issue in this case. PIR ¶ 181.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-19-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

absence of aggravating factors, support a downward variance from the low-end of the advisory guideline range.

### A.    Mr. Wright's Long Career as An Exemplary Public Servant

Prior to being named General Manager of the LADWP, Mr. Wright had worked successfully for nearly three decades in managerial positions in the public sector.  He had always been an excellent manager and, apart from the instant matter, Mr. Wright has served the citizens of California well and faithfully.  His strong work ethic and passion for public service enabled him to work his way up to the highest levels of the public utility industry.  In mitigation, Probation noted that "[p]rior to his involvement in the instant offense, Wright had established a long, successful, and productive career free of impropriety." ECF 35 at 6.

Moreover, Mr. Wright's colleagues consistently describe him as having gone above and beyond as a public servant.  Mr. Bacich writes: "[m]any of the solutions Mr. Wright brought to fruition were not even part of his duties as outlined for the General Manager of his department. They were for the good of the city and community overall."  M. Bacich Ltr., Ex. 7.  Frederick Mason Lewis, who served as General Manager of City of Banning Electrical Utilities, writes that "Dave was always looking for ways to help out individuals and organizations that needed assistance" and even ensured that Riverside, as the larger utility with more resources, provided as much support and assistance to nearby cities like Banning, Colton, and Azusa as necessary. F. Lewis Ltr., Ex. 8.

### B.    Mr. Wright Is A Pillar of His Family and Community

In his community, Mr. Wright used his position to help those around him, sponsoring community events and creating a community low-income support system.  Mr. Wright's kindness made a difference on a personal level.  Jerry Rogers, who has known Mr. Wright since 1989 and worked with him at RPU, wrote "Mr. Wright's compassion and character have always been his best qualities."  For example:

> Mr. Wright managed an employee who had falsely filled out her application for a promotion.  Her transgression was later discovered after she had been on the job for a couple of years.  While her performance on the job was very good, Mr. Wright, as General

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-20-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

Manager, had to deal with the falsified application. After much discussion and thought, Mr. Wright put a plan together that demoted her back to her original position and required her to obtain her GED within one year. Mr. Wright could have simply terminated her employment, but the humanitarian side of his character saved her career and her livelihood. Today this woman is a valuable employee of Riverside Public Utilities. She obtained her GED in just eight weeks and also her bachelors and master's degrees from California Baptist University. A true success story made possible by Mr. Wright's action and the employee's determination after being provided a second chance. J. Rogers Ltr., Ex. 9.

As for his family, Mr. Wright has been an excellent father to his three children, a highly supportive figure to his ex-wife, and a loving, committed partner for the past 18 years. As Mr. Wright's partner Vincent writes, "David has always been a fair, compassionate, and trustworthy individual that many people could always rely and count on; many of us will continue to love and respect him. It has been that mutual respect and love that has kept us together for 18 years." V. Price Ltr., Ex. 6. Mr. Wright has provided support and stability to his family through many upheavals. As described above, Mr. Wright made it his mission to ensure his ex-wife, Carolyn, landed on her feet after the divorce. He financially supported Carolyn while she went to night school and pursued her teaching credentials—even though he was not obligated to do so—because it was the right thing to do. Carolyn observes: "Dave loves his family so much. He is always there when any of us need him." C. Wright Ltr., Ex. 3.

Mr. Wright shares a good relationship with his three sons and five grandchildren, and they see each other at least once per week, and sometimes more. PIR ¶ 96. In his letter, Mr. Wright's son Spencer writes:

My [dad] plays an active role with his children, grandchildren, partner, and my mother. He has always been there to call and talk to you about your day, offer advice, console you when you are having a rough time. He cares deeply about his family. He has been there to provide guidance to my brothers and me, and to watch his grandchildren grow up. He attends their t-ball games, dance recitals, birthdays, hangs out with them on weekends and weekdays, the list goes on. He loves all of us and we love him. S. Wright Ltr., Ex. 5.

Finally, Mr. Wright's primary pastime outside of work benefits his community. Mr. Wright has been fixing up houses since he was an adolescent. For years he has helped his friends and

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-21-                    DEFENDANT'S SENTENCING MEMORANDUM
                        2:21-CR-00559-1

family with their homes in Anaheim and Riverside.  PIR ¶ 117.  Mr. Wright even previously won a Neighborhood Beautification Award.

The letters submitted by those who know Mr. Wright best speak for themselves.  He is regarded by everyone with whom he comes into contact as an honest, kind, and caring man of integrity.  Mr. Wright's greatest wish is to continue to be a productive member of society as he enters his later years, whether that means continuing to help with his grandchildren, designing yards for his friends, or mentoring gay youth.  PIR ¶¶ 116-18.  Mr. Wright is heartsick over the mistakes he has made.  He is a man of high values, and his actions and mistakes in this case have brought shame upon himself and his family.

### C.     Mr. Wright's Clean Record

Mr. Wright's total absence of a criminal history goes beyond the conduct captured by the sentencing guidelines' Criminal History Category I and demonstrates how much of an outlier this conduct is in his otherwise upstanding life.  Probation's letter to the Court notes that:

> Wright not only has no criminal history, he does not have any history of law enforcement contact.  It appears that his behavior in the instant offense represents a marked deviation from an otherwise law-abiding life.

ECF 35 at 6; see *United States v. Howe*, 543 F.3d 128, 133 (3d Cir. 2008) (affirming below guideline sentence based, in part, on finding that defendant guilty of two counts of wire fraud had made an "isolated mistake").  The support letters submitted by Mr. Wright's family and others consistently demonstrate their shock at his offense, as it was completely out of character—a lapse in judgment.  *United States v. Suarez-Reyes*, 2012 U.S. Dist. LEXIS 178771, at *16–18 (D. Neb. Dec. 18, 2012); *United States v. Rowan*, No. 06-321, 2007 U.S. Dist. LEXIS 2126, at *26–30 (E.D. Pa. Jan. 10, 2007) (imposing sentence of probation with home confinement for mail fraud conviction based on defendant's history and isolated nature of crime in that history).

### D.     Need to Avoid Unwarranted Disparities Among Similar Offenders

Under U.S.S.G. § 3553(a)(6), the court should consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  U.S.S.G. § 3553(a)(6).  According to the U.S. Sentencing Commission's data analyzer,

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-22-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

in 2020, 68.4% of comparable defendants—i.e., defendants sentenced for bribery/corruption, in sentencing zone D, with a criminal history category of I, in California—were sentenced to up to 24 months.[18]   In fact, the average sentence for Mr. Wright's similarly situated defendants was 18 months.  *Id.*  The median was 12 months.  *Id.*  Only 5% of similar defendants were given a sentence over 60 months.  *Id.*  Accordingly, Mr. Wright would be an outlier among similarly situated defendants if he receives a sentence beyond 24 months.

### E.    Mr. Wright's Deep Remorse and Plea for Compassion

Shortly after his arrest, Mr. Wright took full responsibility during these proceedings and has consistently expressed his remorse.  Mr. Wright's contrition is clear to anyone who knows him.  He is distraught over the fact that he has betrayed the trust of the LADWP and those who know him best and looked up to him.  Karen A. Hayes worked with Mr. Wright when he served as CFO at the LVVWD.  Ms. Hayes writes:

> The recent legal difficulties that Dave has encountered have been very surprising to me.  He has expressed to me his deep remorse [regarding] the activities that occurred at the end of an outstanding, distinguished career.  Dave deeply loves and is loved by his family. The consequences of his actions have been devastating to all involved.  Lengthy prison sentences would benefit no one and hurt many.  Dave is very aware of the pain and disappointment his actions have caused to those he loves the most and I feel that he should be given the opportunity to put these mistakes behind him and spend the remainder of his life with his loving friends and family.  K. Hayes Ltr., Ex. 11.

Lynn Scott, who worked at RPU for more than two decades and initially served as Mr. Wright's secretary, observes:

> I believe a protracted incarceration of Mr. David H. Wright would be detrimental not only to his family and friends but to the communities who would be lucky to have him work for them and with him.  Dave is a beneficial asset to any establishment and he would be more useful working in public than in captivity. . . . I only know Dave as an excellent father, an outstanding boss and manager of people, and as a kind and helpful friend that gave me, a widowed woman, a chance to excel and be able to take care of myself in my retirement, my golden years.  I can only hope you will see Dave as an asset to any

---

[18] Data Analyzer, Ex. 1 (https://www.ussc.gov/research/interactive-data-analyzer).

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-23-                    DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

city and its residents and will be lenient with your decision.  L. Scott Ltr., Ex. 12.

Mr. Wright has further demonstrated his contrition before sentencing by cooperating fully with the Government, as detailed above.

## CONCLUSION

Mr. Wright is a caring and sensitive man who found himself in way over his head in dealing with the political environment at the LADWP, which as nearly anyone "in the know" will readily acknowledge is an extremely difficult place to work.  Mr. Wright's problems were exacerbated by the fact that his beloved father died about 18 months after Mr. Wright began working at the LADWP.  At that point, Mr. Paradis stepped into the breach and influenced Mr. Wright to make a number of mistakes that ultimately led to the instant charges.  All of this occurred as Mr. Wright battled health concerns.

Mr. Paradis's nefarious influence on Mr. Wright does not excuse his criminal conduct. Based on his long experience working in the public sector, Mr. Wright knew what the rules were, and he knew better than to discuss details of potential employment with an outside vendor of his employer.  Although Mr. Wright did not have a vote on the Aventador contract, he abused his power by supporting the action to the LADWP Board members.

That being said, there are several powerful reasons to leaven justice with mercy.  As the Court considers what constitutes a reasonable sentence under the factors of Section 3553(a), we respectfully point to the Supreme Court's admonition that "the punishment should fit the offender and not merely the crime." *Pepper*, 562 U.S. at 487–88.

On behalf of Mr. Wright, we respectfully ask the Court to show leniency, in light of his many positive personal characteristics, his prior spotless record, his excellent work history, and the fact that, based on his clear contrition, he is extremely unlikely to ever reoffend, and impose a sentence well below the applicable Guidelines range.

Given the totality of the factors, however, we strongly believe that justice can be served in this matter by a sentence less than 24 months.  This sentence would be "sufficient, but not greater than necessary" to serve the ends of justice and fulfill the sentencing aims set forth at 18 U.S.C.

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

VP/#55494026.6

-24-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

1    § 3553(a)(2), while leaving Mr. Wright some hope of rebuilding his life, once he has paid for his

2    wrongdoing.

3

4    Dated: April 12, 2022                              VEDDER PRICE (CA), LLP

5

6                                                       By: _____

7                                                           Anthony Pacheco
                                                            Brooke E. Conner
8                                                           Maura L. Riley

9                                                       Attorneys for Defendant
                                                        David H. Wright

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

VEDDER PRICE (CA), LLP
ATTORNEYS AT LAW
LOS ANGELES

-25-

DEFENDANT'S SENTENCING MEMORANDUM
2:21-CR-00559-1

VP/#55494026.6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>CERTIFICATE OF SERVICE</u>**

      I hereby certify that on April 12, 2022, I caused to be electronically filed a true and correct copy of the foregoing with the Clerk of Court using the CM/ECF system and that all counsel of record will be served via the Notice of Electronic Filing generated by CM/ECF.

                                              /s/ Anthony Pacheco
                                                Anthony Pacheco