1

1    UNITED STATES DISTRICT COURT
     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
2    HONORABLE STANLEY BLUMENFELD, JR., U.S. DISTRICT JUDGE

3


4    UNITED STATES OF AMERICA,

5                        Plaintiff,

6      v.                                  Case No.
                                           2:21-cr-00559-SB-1
7    DAVID H. WRIGHT,

8                        Defendant.
     _____

9

10

11

12                REPORTER'S TRANSCRIPT OF PROCEEDINGS
                          SENTENCING HEARING
13                          APRIL 25, 2022
                             1:51 P.M.
14                     LOS ANGELES, CALIFORNIA

15

16

17

18

19

20

21

22   _____

23                    JUDY K. MOORE, CRR, RMR
                   FEDERAL OFFICIAL COURT REPORTER
24                   350 WEST 1ST STREET, #4455
                   LOS ANGELES, CALIFORNIA 90012
25                         213.894.3539

1                                      APPEARANCES

2     FOR THE GOVERNMENT:

3     MS. MELISSA E. MILLS
      MR. J. JAMARI BUXTON
4     MS. SUSAN S. HAR
      Assistant United States Attorneys
5     312 North Spring Street
      Suite 1300
6     Los Angeles, California 90012

7

8     FOR THE DEFENDANT:

9     MR. ANTHONY PACHECO
      MS. MAURA L. RILEY
10    MS. BROOKE E. CONNER
      Vedder Price, L.L.P.
11    1925 Century Park East
      Suite 1900
12    Los Angeles, California 90067

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings commenced at 1:51 p.m.)

2    COURTROOM DEPUTY:  Calling Item 4, Case Number

3  21-cr-559, United States of America vs. David H. Wright.

4    Counsel, please state your appearance, starting with

5  the Government.

6    MS. MILLS:  Good afternoon, your Honor.  Melissa

7  Mills, Susan Har, and Jamari Buxton on behalf of the United

8  States.

9    THE COURT:  Good afternoon.

10    MR. PACHECO:  Good afternoon, your Honor.  Anthony

11  Pacheco on behalf of David Wright.  Mr. Wright is present in

12  court on his own recognizance.

13    For purposes of the Court, your Honor, I will tell

14  you that his family, friends, spouse, and ex-spouse are

15  present.

16    THE COURT:  Very well.  Thank you.  And please be

17  seated.

18    This matter is here for probation and sentencing.

19  Let me start with a reminder that there is no recording,

20  photographing, publishing, broadcasting of these proceedings.

21  That is strictly prohibited.  And as indicated, this is here

22  for sentencing.

23    Mr. Wright was convicted on January 25th of this

24  year, pursuant to a plea agreement, and he was convicted on

25  Count 1 for bribery in connection with programs receiving

**4**

1  Federal funds, in violation of 18 USC, Section 666, Subsection

2  (a)(1)(B), with also a forfeiture allegation.

3          Let me start with Ms. Mills.  Has the Government

4  complied with victim notification in this case?

5          MS. MILLS:  Yes, your Honor.

6          THE COURT:  And is there any victim who intends to

7  address the Court?

8          MS. MILLS:  No, your Honor.

9          THE COURT:  Thank you.  The Court also has reviewed

10  the papers in this case, and they include, among other things,

11  the pre-sentence report as revised, the addendum, the

12  recommendation.  I also did receive and reviewed the very

13  substantial position papers by the parties, which include the

14  Government's sentencing memorandum with a number of exhibits,

15  as well as some recordings, which I believe comprised at least

16  one audio recording and two video recordings.  I have reviewed

17  all of the information submitted.

18          The defense has submitted a substantial sentencing

19  memorandum with numerous exhibits, 32, I think, exhibits,

20  almost all of which, other than, I believe, the first, were

21  comprised of character letters, and I have reviewed all of it.

22          I also have received and reviewed the defendant's

23  objections to the pre-sentence investigation report.  So with

24  regard to the objection, it appears that the objections were

25  well-founded.  They had to do with statements of facts in the

1  pre-sentence report, and the Probation Department has made

2  those corrections in the addendum, I believe, to the

3  pre-sentence report.  Otherwise, my understanding is there have

4  been no other objections lodged.  There obviously is a

5  substantial dispute between the parties as to the appropriate

6  sentence and how the Court should analyze the statutory

7  factors, et cetera.

8        Am I correct that the Government has no objection?

9        MS. MILLS:  Yes, your Honor, that's true.

10        THE COURT:  Is that also true for the defense, other

11  than the separate objection you lodged?

12        MR. PACHECO:  Yes, your Honor.

13        THE COURT:  All right.  So then the Court is going

14  to find that the pre-sentence report as corrected is accurate,

15  and I adopt the report and its calculations of the advisory

16  sentencing guidelines, which the Court has consulted but does

17  not presume are the appropriate guidelines or the appropriate

18  sentence that should result from those guidelines.

19        The range, however, is as follows:  Just looking at

20  the sentencing guideline range with respect to the total

21  offense level of 33, the guideline range is 135 to 168 months,

22  but that is cabined by the statutory maximum, which is 120.  So

23  the maximum sentence here is ten years, or 120 months.  The

24  sentence -- or the supervised release range is one year to

25  three years.  The fine range is 35,000 to 350,000.  The

mandatory special assessment is $100.  As I've said, the total
offense level is 33 months, which is calculated as follows:   14
is the base offense level, which is increased by 20, taking
into account a number of the specific offense considerations,
which are more fully set forth in the pre-sentence report, plus
two for obstruction of justice.  And the specific offense
characteristics comprise, largely, the amount of bribe that was
at issue, along with Mr. Wright's position of trust, minus
three levels for the acceptance of responsibility.  That's how
the 33 is calculated.  Mr. Wright's Criminal History Category
is a Level I.  He has no criminal history.

The Court has reviewed the positions of each of the
parties, which are as follows, in terms of the bottom line:
The Government is requesting 97 months in custody, followed by
three years of supervised release, a $100,000 fine, plus a $100
mandatory special assessment.  The defense is requesting a
sentence of 24 months or less, or less than 24 months.  That
was a little bit ambiguous, but that's how the Court interprets
it.  I don't believe there's any indication of what supervised
release -- or whether there was an objection to what the
Probation Department was recommending.  I will assume not
unless I hear differently.  I don't recall seeing, but maybe I
overlooked the dollar figure for a fine that was being
proposed.  And a mandatory special assessment of $100.  The
Probation Department is suggesting 72 months in custody,

followed by three years of supervised release; a fine of
$35,000; a mandatory special assessment of $100, along with
mental health, as well as a physical health evaluation.

Let me start with the defense.  Did I overlook the
defense position with regard to supervised release or the fine,
or are you just submitting to the Probation recommendation?

MR. PACHECO:  We are on -- as to the fine, we are
submitting to Probation.  And the same is true for supervised
release.

THE COURT:  All right.  So let me provide the
parties with the Court's analysis, and then I will hear from
you, including from Mr. Wright if he wishes to be heard.

This case is truly a tragedy.  It's a tragedy
because the nature and circumstances of this offense are pretty
egregious, and when I read the character letters, which are
moving, especially the character letters of his ex-wife, his
current partner, his three sons, among others, they are moving.
There is a disconnect between the person who is described in
these character letters and the person who committed this
egregious offense.  And this Court's task is essentially to
exercise its judgment within legal bounds to determine how that
appropriately shakes out ultimately.

I'll first describe the nature and circumstances of
the offense.  This was a bribery scheme involving an elaborate
and sophisticated secret plan, a quid pro quo, and at its core

1  was a plan to steer a very large no-bid contract to a newly

2  formed company in exchange for Mr. Wright obtaining substantial

3  benefits as what can be characterized as an exit strategy after

4  completing his time and tenure at the LADWP, which included a

5  million dollar salary, a substantial bonus, a luxury car, among

6  other things.  And, again, the scheme was elaborate and

7  sophisticated and required a substantial effort to try to pull

8  off, because it was no easy feat, as I see it, to try to

9  convince the organization, including the LADWP Board, that,

10  first of all, this $30 million no-bid contract was necessary,

11  that these services were necessary.  Not only were they

12  necessary, but they were urgently necessary, so urgent that a

13  no-bid contract should be awarded.  And then beyond that, this

14  no-bid contract should be awarded to this newly formed company

15  which deserved this extraordinary contract.

16         And so in that context, I believe it could be better

17  appreciated the nature of this scheme and what it took in order

18  to pull it off and to understand Mr. Wright's role in the

19  scheme.  It took lobbying, it took persistence, and it took a

20  lengthy period of time to pull this off.  And Mr. Wright came

21  fairly close, along with Mr. Paradis, of pulling this off.  And

22  it's P-A-R-A-D-I-S.  And I'm not even certain that I'm

23  pronouncing his name correctly, but that's how I recall it.

24         And so while the Court appreciates the defense's

25  position that Mr. Wright was taken in by the charms, if you

will, the allure, the charisma, whatever it was that
Mr. Paradis has, to get engaged and involved in this scheme,
the Court, at the end of the day, cannot conclude that
Mr. Wright was taken in, at least not fully, maybe initially.
Mr. Wright ultimately was all in, as I reviewed this record.
As I've indicated, Mr. Paradis, I'm sure, is an alluring and
influencing figure.  I don't have a submission from
Mr. Paradis, and at some point I might, but the record that I
see, I think, provides some support for that.

But while the defendant undoubtedly was vulnerable,
and I accept that -- he was lonely, under tremendous stress, I
credit his -- the insecurities that were pointed out, I have no
reason to doubt that those were real, they were real stressors,
they rendered him vulnerable, more vulnerable than he perhaps
otherwise might have been, but that vulnerability, in my view,
takes him only so far in terms of understanding this matter.

The defendant, as reflected in these character
letters and as reflected in terms of his background and
history, has been an extraordinarily successful person, someone
who was able to achieve financial security, someone who held a
powerful position, who was at the zenith of his power, heading
this behemoth organization called the LADWP, and he managed to
dupe other sophisticated individuals by promoting and lobbying
on behalf of this scheme.  And while he was undoubtedly
vulnerable, it doesn't account for this conduct.

1    What does appear to account for the conduct that I
2  have seen, as baffling as it is to this Court in light of what
3  I understand to be Mr. Wright from these letters -- and I have
4  no doubt they are heartfelt letters -- is how someone who has
5  his financial success, who has reached the level of prominence
6  that he has reached, would allow himself to submit to free
7  perks that started it off, free meals, free games, all of which
8  constituted ethical lapses, and then have that lead to this
9  type of extraordinary exit strategy where he would, not only
10  make substantial money properly in his role as the head or the
11  general manager of the LADWP, but also have a very, very soft
12  landing that was illegal, baffling, in this Court's view.

13    He was not a man in dire financial straits.  He was
14  quite the contrary, someone who had financial success; someone
15  who, in addition to having financial success, had tremendous
16  other personal successes.  His family is a tribute to that and
17  friendships are a tribute to that.  So it appears that the
18  motive here was pure greed and the pursuit of excess riches.
19  And I say excess because he had a very substantial financial
20  portfolio to begin with.

21    And then the Court considers the fact that when the
22  plan unraveled, Mr. Wright did take another wrong turn, which
23  was his instincts were to destroy the evidence of the
24  wrongdoing, as opposed to correct things or set things in the
25  right direction.

1      So in short, when I look at the nature of the
2  circumstances and this offense, what I see is the head of a
3  large public utility whose job it was to safeguard the
4  interests of the DWP and its rate payers, an extraordinarily
5  important, difficult job, but clearly important, a position of
6  tremendous trust, and yet he elevated his personal interests
7  above his sacred trust.  And he did so, it appears to the
8  Court, solely for greater riches, and in the process, he did
9  bring disgrace, not only to himself, as he recognizes and takes
10  responsibility for, but also for the organization itself.

11      On the other side of the equation is that, while the
12  defense describes this conduct as aberrational, I believe it
13  was an aberration in part.  It was an aberration in the sense
14  that if you look at the total history of Mr. Wright and his
15  life, this is completely out of that history.  This is
16  something that no one, I think, would predict.  And in that
17  sense and in the sense that it comes at a later point in his
18  life, as I said, where he has reached the height of his career
19  and is looking over the hill, if you will, to an extent, that
20  he would engage in this conduct -- and it wasn't conduct that
21  simply had him making one wrong decision; it was a series of
22  decisions and a commitment to a plan.

23      But, nonetheless, he is someone has no criminal
24  history.  He is someone who is very well-educated, who has had
25  a successful career up to that point.  He rose in the ranks and

1  he pulled himself up by his own efforts, by his dedication, by

2  his skills, and with the help of a very supportive and loving

3  family, including his ex-wife, which was touching to see the

4  relationship that Mr. Wright continued to have with his ex-wife

5  after they split and the maturity and wisdom to have that type

6  of relationship, not only for their own benefit, but for the

7  benefit of their three children, who have grown into being fine

8  young men, very successful, dedicated, committed individuals

9  who themselves are on the road to having similarly successful

10  families.

11       So with regard to the defendant, his history, his

12  characteristics, there's a lot to see there that is quite

13  positive, and with regard to his prospects for rehabilitation

14  and the support that he will get, it's clear to me that that is

15  a substantial mitigating factor.

16       The Court has also taken into account some of the

17  mental health issues that have been described in the

18  pre-sentence report, which I don't intend to get into in much

19  detail, but I do believe that they're real.  I do believe that

20  Mr. Wright had substantial insecurities and struggles that

21  started at an early age and continued with him for most of his

22  life.  And, in my view, that is something that should be taken

23  into account for mitigation.

24       Also, while Mr. Wright, for a long time, was

25  committed to doing the wrong thing, when he finally decided to

1  do the correct thing, he did it with gusto.  He, according to

2  the Government, from what I can see, was fully forthright when

3  he decided to be forthright, and attempted to assist the

4  Government in any way that he was able to do so.  And the

5  Government, to its credit, was candid in setting forth that in

6  its papers.

7          Also in terms of mitigation, there is no actual

8  monetary harm.  That is to say that, ultimately, the scheme

9  wasn't fully fruitful and productive.  But I do not credit the

10  idea that a future promise of employment and wealth should be

11  devalued because he didn't have it in hand.  In my view, that

12  is not something that is mitigating here.  The fact that he

13  didn't have it in hand doesn't detract in any way from the fact

14  that he was maneuvering and his conduct, which was poor and

15  egregious conduct, was all driven towards the aim of achieving

16  that level of riches.

17          Also in this Court's view, his age is a mitigating

18  factor.  He's 62 years old now, and so the Court takes into

19  account what the years in custody means and what it will

20  potentially do for him, both in terms of any harmful effect on

21  him and his family, but also the extent to which it will be

22  productive from a rehabilitation standpoint.  So I do consider

23  that to be a factor in the analysis.

24          Here's where all of this comes down to -- and I'll

25  give the parties the Court's tentative in a moment, and then

1  I'll hear from you.  And I will tell the parties that this was

2  a difficult decision because, as I mentioned, the conduct, in

3  my view, is quite egregious, but, on the other hand, there are

4  these substantial mitigating circumstances.  And both sides

5  really presented the issues as strongly as they, in my view,

6  conceivably could have to promote their respective viewpoint.

7         The Court has looked at the need for the sentence to

8  reflect the seriousness of the offense; to promote the respect

9  for the law; to provide just punishment; to deter criminal

10 conduct, both in terms of affording adequate deterrence to

11 criminal conduct by the defendant, but also, more generally, to

12 deter criminal conduct.  In this Court's view, what is

13 substantial, or at least is significant, is not necessarily

14 specific deterrence but general deterrence, is a factor that

15 weighs in the Court's analysis; the need to protect the public

16 from further crimes by the defendant; the need to provide the

17 defendant with appropriate program and -- programs and

18 treatment.

19         I have considered other types of available

20 sentences, as well as the need to avoid unwarranted sentencing

21 disparities.  I will tell the parties that I did look at

22 Exhibit 1 to the defense's submission, and I'm sure I will hear

23 from you on this, Counsel, but while seeing 24 months is of

24 some value, it's of somewhat limited value to the Court because

25 the sentencing is, of course, very fact-specific, and in the

absence of really being able to compare apples to apples, that
benchmark is of at least somewhat circumscribed value to the
Court.  And at the end of this process, I will tell you that
the Court did consider coming out closer to the Government's
position in this case and largely because of the scheme, as I
have described it at great length, and also the Court's concern
about making sure that there is an appropriate deterrence and a
message of deterrence to people who are in the position of
trust that Mr. Wright is in, that the need to honor that trust
and not to engage in the type of conduct, let alone to the
extent of this conduct, is important and that the sentence
properly reflect that.

On balance, the Court agrees ultimately with the
Probation Department's recommendation of 72 months in custody,
followed by three years of supervised release.  I believe a
greater fine is necessary than $35,000, but looking at the
financial picture that I saw, I believe an appropriate fine in
this instance is $75,000 and a $100 mandatory special
assessment.  That is the Court's tentative.  Let me start by
hearing from the defense, and then I'll hear from the
Government if the Government wishes to be heard.

MR. PACHECO:  Thank you, your Honor, for your
detailed view of the case and obvious time spent with it.  I
don't think in this case there are a lot of disputed facts.  I
think what we've got is some context, and where the Government

1  and Mr. Wright part are on issues of context.  And here, I

2  understand the Court's tentative view to accept the Probation's

3  recommendation.

4          Your Honor, I think a couple of things in terms of

5  context.  The Court did reference Exhibit 1 to our sentencing

6  submission.  That was prepared by the U.S. Sentencing

7  Commission.  It's available on site.  It's intended to give the

8  Court a good view of cases that applied the bribery statute so

9  that the Court could avoid unfair sentencing discrepancies.

10 What's interesting about those 19 cases is that only one of

11 those cases, your Honor, even approach 60 months, and the

12 average case was at 12 months, and the median case was at 18

13 months.  And I do recognize, and I heard the Court when the

14 Court said, yes, of course, the facts could be different, but

15 this is a summary of all of the cases nationwide that have

16 applied that particular statute in the bribery context, and

17 they are substantially lower even than Probation.

18          I think one thing is clear here, and that is that

19 all the parties agree that the sentencing guidelines are too

20 high.  Even the Government has made a recommendation which

21 is -- I understand their recommendation.  Probation has

22 recommended a downward variance.  And, your Honor, we have

23 sought a downward departure because loss overstates the

24 seriousness of the offense, and we've also sought a downward

25 variance as to loss overstates, your Honor, here, the Court is

1    right that there was a discussion about a million dollars and

2    that Mr. Wright would be the CEO of Aventador.  There was also

3    discussion of a sign-in bonus.  And then there was a discussion

4    of a car.  And while I do understand that this was not

5    completed -- these items were discussed, no money changed hands

6    in that way, your Honor.  There was never any payment.  There

7    was no cash, nothing like that.  There were some, as the Court

8    said, ethical lapses, and we acknowledge that, with some meals

9    and some hotel expenses, some tickets, but at the end of the

10   day, your Honor, I think when you look at this, the numbers

11   don't match the crime, they really don't here, and they don't

12   really influence and shouldn't influence the sentence in terms

13   of keeping it at a high level, your Honor.

14          I do think, your Honor, that Probation came out

15   where it came out, but I do think that if they had greater

16   powers, I think that they would have come lower, because when

17   you look at their report, your Honor, it's very

18   defendant-friendly as to a lot of these factors.  So what the

19   Government has said in response to Probation is, well, we've

20   gotta treat Mr. Wright differently than what Probation suggests

21   because he's got an education and he's got a history of

22   employment, and we don't want to suggest that he's -- I think

23   the word they -- well-healed, I think, so they tried to

24   describe him as sort of a big-time sort of executive.  And so I

25   think, though, when you strip that back, you've really got

something else.  And I think what has -- the Court has put its
finger on the pulse that there's an issue here that's baffling.
The Court said it twice, I heard it, and I was baffled about
this as well, and that is, why would an individual toward the
end of his career engage in this kind of conduct and why would
it be, as the Court said, elaborate and sophisticated?  Well,
your Honor, I think it was a panic.  I think it was a major
panic by Mr. Wright, who had gotten in way over his head,
wasn't at all expecting DWP to give the big-time political kick
that he was going to endure, that he had inherited a horrible
billing problem at DWP.  When he stepped into DWP, he was
referred to as sort of gay leadership, which just fostered a
lot of very negative things from his past.  He never intended
to, never wanted to be the spokesman and role model in that
way, in such a public way, and being outed in that way
publicly.  He just wanted to do his job.  And what happened is,
I think this just got away from him.

        And I do think, your Honor, he was willing to engage
in some of this conduct.  We're not arguing anything to the
contrary.  But I will say, when you look at the stressors, his
father had passed, he was lonely in this position, he did look
up to Paul Paradis.  Paradis was a distinguished lawyer.
Paradis had a prior history with DWP that even preceded
Mr. Wright, and he was a smart guy that Mr. Wright looked up
to.  And Mr. Paradis played him like a fiddle and, I think,

1    worked him toward getting what he wanted on the Aventador

2    contract.  And then when all hit the wall, then Mr. Paradis,

3    what he ended up doing, your Honor, was working to build a case

4    in a very sophisticated and elaborate way to get -- to build a

5    case so that he could get credit on the back of Mr. Wright.

6           So we're not here, your Honor, to say that

7    Mr. Wright didn't engage in this conduct.  That's not the

8    factual dispute.  It's really one of a balance.  It's one of

9    what's the appropriate sentence?  What is, under Section

10   3553(a), what is sufficient but not more than necessary, your

11   Honor?  And so I think, your Honor, in this particular case, we

12   are faced with some, as the Court said, baffling issues.  And

13   when -- 72 months, your Honor, for a 62-year-old man, and this

14   large fine, I think, your Honor, makes it challenging for him

15   to ever recover his life, despite the fact that he course

16   corrected as best he could under the circumstances.  Yes, he

17   made horrible judgments, but he did course correct and he did

18   do the right thing ultimately.  He did get there, your Honor.

19          Now, your Honor, I will tell you, I've been with

20   this case for three years.  I've seen Mr. Wright for three

21   years struggle.  I've seen the immeasurable pain on this man.

22   I've seen him age in front of me and I've seen the trauma that

23   has gone along with this case.  So to think that he hasn't been

24   punished for three years even approaching this day would be a

25   mistake.  I think that he has, your Honor.  And I think what

1  has eaten him up, your Honor, is that how did he find himself

2  in this horrible circumstance?  It's not that he got caught

3  that's what's troubling him.  What has troubled him is that he

4  feels that he's failed.  He's failed his family.  He's failed

5  his colleagues at DWP.  He failed the public.  And so he's not

6  wanting to step away from that.  I don't think that he can.

7  But what, your Honor, I think all we're asking for is some

8  leniency, some mercy here, so that he can recover and recoup

9  what's left of his days.  Thank you, your Honor.

10          THE COURT:  And Mr. Wright does wish to be heard?

11          MR. PACHECO:  Yes.

12          THE COURT:  All right.

13          THE DEFENDANT:  Thank you, your Honor.  So I really

14  messed up the rest of my life at the end of my career.  I never

15  thought my life's work in public service would end this way.  I

16  never imagined my desire to help my community, to serve the

17  public, would come crashing down with my bad actions.  I had

18  much higher aspirations and I dreamt much bigger and sincerely

19  wanted to build a better community through good deeds, hard

20  work, concern for the public good, but, your Honor, I broke the

21  law, and I know that.  I did not listen to my better conscience

22  or my rational self.  I horribly, stupidly, and

23  heartbreakingly, made bad decisions, bad judgments, and I have

24  no one to blame but myself, no one else, just me, just myself.

25          My misconduct developed from selfishness and

anxiety, as I was approaching the end of my career and wasn't sure what the future held. I didn't enjoy my time at LADWP and the visibility and negativity of my time there. I lost my dedication and concern for the organization and focused on myself and a potential future. I hoped I could secure future employment and have the possibility of a brighter financial future, though as you said, your Honor, I was not in a bad place. Being selfish, though, and being anxious about my future, however, is not a good reason to violate the law. The concerns I had do not excuse my behavior. I only mention it to give the Court context of what happened.

I'm sad to my very core. I'm especially sad that I've in -- of what I've inflicted on my family. I've caused shame and embarrassment they'll have to live with forever. How do you explain to a five-year-old grandchild what happened to Papa Dave, on his birthdays, holidays, little league games, dance and music recitals, and family get-togethers, not because of health issues or issues that are uncontrollable, but because I acted illegally and illogically. I'll miss sitting in the waiting room as future grandchildren are born. My children now carry the stigma of a father who's a convicted felon.

I failed myself so that I can never work in the fields for which I trained and mostly excelled. I enjoyed my professional work tremendously and am very sad I won't be able to do it again.

1          I want to publicly apologize to all customers and

2    rate payers of the Los Angeles Department of Water and Power.

3    As a boss, I didn't fulfill my duty and act ethically.  I let

4    LADWP staff down by putting my interests ahead of the good of

5    the organization.

6          I also want to apologize to the elected and

7    appointed officials who looked to me to provide leadership

8    expectations that they had placed in me.  And I also want to

9    apologize to all the many good government employees.  A certain

10   portion of the public will criticize anyone who works in the

11   public sector.  For most of my career I fought to improve the

12   image of public employees, but my actions in the last few years

13   have completely damaged any progress towards that goal.

14         I need to share that, while I'm speaking, I slip

15   into a lifetime development of what I call presentation mode.

16   I had 60 years of building up a huge emotional wall, the first

17   half so nobody could know who I was and not get close, and the

18   second half to handle contentious public meetings and

19   negotiations.  While I appear confident and calm on the surface

20   while making these remarks, I will tell you, this is not the

21   case.  Internally, I am an emotional mess.  I acted

22   disgracefully, and I am so sorry.

23         Your Honor, I would not be standing here today if I

24   didn't have the support of my family and friends.  They have

25   been phenomenal, and I will appreciate that until the day I

1  die.  I'm sincerely remorseful and embarrassed and can think of

2  no words to convey my sorrow or shame to anyone and everyone.

3          I appreciate the Court hearing what I have had to

4  say and for reviewing my sentencing papers.  Thank you, your

5  Honor.

6          THE COURT:  Thank you, Mr. Wright.

7          I'll hear from the Government.

8          MS. MILLS:  Thank you, your Honor.

9          THE COURT:  And please make sure that you do address

10  the sentencing disparity issue, among other things that you

11  intend to address.

12          MS. MILLS:  Yes, your Honor.  Will do.

13          Your Honor, I'd like to echo Mr. Pacheco's comments.

14  The Government also appreciates the Court's very detailed

15  analysis that it provided.  It is very clear that the Court not

16  only read and reviewed everything but thought through the

17  issues deeply, and we appreciate that as well.  This is a very

18  difficult case, as the Court stated, and there are compelling

19  factors on both sides.

20          I just want to address a couple of points that the

21  Court raised and that the defendant raised.  The first is a

22  comment that the Court made in its analysis, and that was that

23  there was no actual monetary harm as a result of this conduct,

24  and I would respectfully disagree with that, your Honor.  As we

25  articulated in our sentencing papers and as is explained in a

1  couple of the sentencing exhibits, particularly the report of

2  interview of Gwen Williams and the report of interview of Paul

3  Bender, the entire $30 million contract that the defendant

4  pushed through the Board was arguably, at least according to

5  Mr. Bender, who was used to push that contract through, was

6  completely unnecessary, and so the cost of that contract was

7  pushed onto LADWP and its rate payers, who were then required

8  to bear those costs.  And so this was real money involved, and

9  there was real harm involved.

10         THE COURT:  Let me just correct something and seek

11 elaboration from you.  My comments were focused on Mr. Wright's

12 side of the equation.  That is to say that, ultimately, he

13 didn't get the job, he didn't get the million dollars, he

14 didn't get the bonus, he didn't get the car and the perks,

15 which doesn't mean that there wasn't an impact or harm.  The

16 Court believes that there was substantial impact and harm to

17 the organization.  But maybe you could elaborate on what the

18 record states, if anything, with regard to the monetary harm

19 that was done to the organization.

20         MS. MILLS:  Yes, your Honor.  And, specifically, I

21 was referring to the account of Mr. Bender that pointed out

22 that the contract -- the entire $30 million contract was

23 arguably not necessary.  And so I think, according to

24 Mr. Bender, taking his words at face value, that contract --

25 the entire $30 million, I believe 22, give or take, $22 million

1  or so of which was actually expended and given to Mr. Paradis

2  and Aventador and that organization, was arguably not

3  necessary, and so I believe that is 22, give or take, million

4  dollars of harm to LADWP, economic harm or real harm that LADWP

5  sustained.  And that's, of course, in addition to the other

6  harms that we described in our papers, the harm to the

7  institutional integrity, to the morale of the employees, to the

8  respect that the institution has worked hard to gain from its

9  millions of rate payers.

10         THE COURT:  But with respect to the issue that I

11  think was raised by the defense in terms of the valuation, that

12  doesn't take that into account, does it, that is, the value of

13  the bribe?

14         MS. MILLS:  That is correct, your Honor.  And so

15  that is an issue that I also wanted to discuss because the

16  guidelines allow for -- and I believe the guidelines actually

17  require for the loss -- or the amount of bribe to be

18  calculated -- the amount of loss to be calculated based on the

19  greater of the value of the bribe or the net value of the

20  benefit.  And this is something that the Government thought

21  about very carefully in crafting a plea agreement offer in this

22  case.

23         The loss calculation, frankly, I think, could have

24  come out much higher, looking at the $30 million contract,

25  looking at -- you know, the net value of that was difficult to

1  ascertain.  It was nebulous because it wasn't a no-show

2  contract.  There was actually work performed.  There were

3  salaries paid.  And so that was hard for the Government to, I

4  think, put a number on it.  And it may be impossible to really

5  put a true number on, and so we looked to the value of the

6  bribe itself.  But that itself is a benefit to Mr. Wright

7  because it could have been substantially higher, just looking

8  at that net value.

9          I think also, the loss calculation that the

10  Government came to, the 1.5 to $3.5 million range, is very

11  generous to Mr. Wright because it assumes only two years in

12  this job.  And I think if the Court looks at the factor -- the

13  facts of the case, Mr. Wright had a long-term plan.  This

14  was -- he was playing the long game and he intended to stay

15  there, I think -- an argument could be made, certainly, that he

16  intended to stay there for more than two years; however, the

17  Government was willing to accept, because life is uncertain

18  and, you know, as the Court and the defense pointed out, this

19  benefit was not ultimately received, the Government was

20  comfortable valuing that at two years of employment, plus the

21  bonus, plus the car.  And so that's how we came out with that

22  range.  But I think it's important that the Court understand

23  that that range itself is a benefit to Mr. Wright because it's

24  much lower than it could have been.

25          THE COURT:  Understood.

1          MS. MILLS:  Thank you.  And then I'd like to address
2    as well a comment that the Court made, and this is something
3    the defendant spent a bit of time on his papers, which is that
4    the fact that he didn't have that value in hand, that wasn't
5    something that he actually obtained.

6          And if I could have just a moment, your Honor.

7          THE COURT:  Yes.

8          MS. MILLS:  In his sentencing memorandum, the
9    defendant pointed to a -- the application note to 2(b)1.1, I
10   believe Application Note 21C, which was -- is a very general
11   guideline that generally states that a guideline that
12   substantially overstates the seriousness of an offense warrants
13   a downward departure.  But there is a guideline application
14   note that more specifically --

15         THE COURT:  A little slower, please.

16         MS. MILLS:  Yes, your Honor.  There is a guideline
17   application note that more specifically addresses this
18   situation and that, in fact, specifically rejects the
19   defendant's position here, and that is the final paragraph to
20   the background section of the application notes for 2(c)1.1.
21   And it states as follows:  "Offenses involving attempted
22   bribery are frequently not completed because the attempt is
23   reported to authorities or an individual involved in the
24   offense is acting in an undercover capacity.  Failure to
25   complete the offense does not lessen the defendant's

1   culpability in attempting to use public position for personal

2   gain.  Therefore, solicitations and attempts are treated as

3   equivalent to the underlying offense."

4          And so I think, your Honor, I wanted to raise that

5   because the defendant spent a significant amount of time in his

6   sentencing papers arguing that because, essentially, he didn't

7   get the benefit of this bribe, there was no harm, no foul.  And

8   I believe the Court made comments to that effect as well, and

9   so I think that was important to point out.

10         THE COURT:  All right.  Although that was not my

11   conclusion, no harm, no foul, but --

12         MS. MILLS:  No, your Honor, and I don't think that

13   was -- I didn't intend to put those words in the Court's mouth;

14   however, I think that was how the way the Court explained its

15   position was the fact that he didn't obtain the ultimate value

16   of those benefits was something the Court took into

17   consideration.

18         THE COURT:  All right.  Anything further besides the

19   issue of disparity?

20         MS. MILLS:  Your Honor, I think the defendant relies

21   pretty substantially on statistics in the sentencing

22   disparities, and I think the statistics here don't account for

23   the specific circumstances of this case.  In this case, the

24   defendant led the -- he was the highest ranking official at the

25   largest public utility in the United States, and he betrayed

1   the public trust for years, repeatedly, over and over, and I

2   think those statistics do not -- they simply don't capture what

3   happened here, to the extent that this sentence would be an --

4   the sentence the Government is requesting would be an outlier

5   among other bribery cases.  This is an extraordinary case, and

6   I think the sentence that the Government is requesting, which

7   is substantially below the guidelines and below the

8   mandatory -- or below the statutory maximum, we believe that

9   that is warranted.

10          THE COURT:  All right.  Anything further?

11          MS. MILLS:  No, your Honor.  Thank you.

12          THE COURT:  Thank you.  I will give you a brief

13  opportunity to respond, especially if there are factual issues

14  that you think you wish to bring to the Court's attention,

15  Counsel.

16          MR. PACHECO:  I only have one, your Honor, and it's

17  just that I misspoke on Exhibit 1.  It was the search of

18  California cases; it wasn't nationwide.  So I wanted to clarify

19  that on the record, your Honor.

20          THE COURT:  All right.  Is there anything else that

21  you believe you need to respond to?

22          MR. PACHECO:  No, your Honor.

23          THE COURT:  All right.  Thank you.  So with that,

24  the Court does appreciate, as I said, not only the written

25  presentations, which were excellent in this case, but also the

1    oral presentations, which also were quite good and helpful to

2    the Court.

3           At the end of the day, the Court believes that it

4    has fairly and thoroughly considered the various statutory

5    factors, the facts that apply to them.  I do find that

6    Mr. Wright's statements to the Court were not only contrite but

7    also, I think, reflect, more so than the Court sees in some

8    other cases, a genuine remorse, not one simply because he has

9    been caught but also a true appreciation and recognition of the

10   harm that he has caused and the wrongfulness of his conduct.

11          But at the end of the day, the Court does believe

12   that this crime was sufficiently serious that the

13   appropriateness of a meaningful prison sentence is important to

14   reflect the seriousness of the offense, as well as to promote

15   respect for the law and to provide adequate general deterrence

16   for any member of the public who has a position of trust who

17   abuses it in the manner that was done here.

18          And while on a human level I understand the

19   stressors that Mr. Wright has described, they simply do not

20   translate in this Court's mind to an adequate explanation of

21   the conduct that Mr. Wright engaged in.  And while I know that

22   a number of these factors undoubtedly came into play, as

23   humans, we're prone to avoid the most ugly of human

24   characteristics and qualities that motivate human behavior, and

25   there is a level of greed here that drove this conduct that is,

1  in my view, an aggravating factor, among other factors as the

2  Court has described them.

3         And so the Court does find that the following

4  sentence is sufficient but not greater than necessary to

5  satisfy the Section 3553(a) objectives:  The defendant is

6  hereby sentenced to a period of 72 months in Federal prison,

7  followed by a three-year term of supervised release, a fine of

8  $75,000.  He is to pay the $30,000 as set forth in the

9  Probation Department recommendation within 30 days, although

10  I'll hear from counsel -- within 30 days, followed by a payment

11  consistent with his ability to pay while he's on supervised

12  release for the remainder of the $45,000.

13         I will want to hear from counsel on that after I

14  conclude this sentence, and that is to say, I have increased

15  the amount of the fine and I want to make sure that I impose a

16  reasonable implementation of it, consistent with his ability to

17  pay.  And so the fine total amount is $75,000.  What I was just

18  now addressing is its payment period.  It is to be followed

19  also with a -- or accompanied by a payment of $100 for a

20  mandatory special assessment, and that amount should be paid

21  within -- or before his surrender or at the time of his

22  surrender.

23         On supervised release, he is to comply with the

24  following terms and conditions:  He is to comply with the rules

25  and regulations of the Probation Department, as well as the

1    Second Amended General Order 20-04.  He must pay the mandatory

2    special assessment as I have indicated.  If he's claiming that

3    he doesn't have the ability to pay, which I believe he does,

4    then he's to pay it at the rate of $25 a quarter while he's in

5    custody.  He must cooperate in collecting a DNA sample.  He is

6    to participate in mental health treatment, including evaluation

7    and counseling, as directed by the Probation Department.  He

8    does have to pay for any such treatment if he has the ability

9    to pay.  He is to submit his person and property, including

10   electronic devices, to search and seizure at a reasonable time

11   and manner, accompanied by reasonable suspicion that he has

12   violated the terms and conditions of his supervised release.

13   He is also to advise any cohabitants of this condition because,

14   as indicated in the prior matter, this does affect their right

15   to privacy.

16          The Court does intend and hereby incorporates the

17   written conditions as set forth in the Probation Department

18   recommendation.  To the extent that the Court's oral summary

19   diverges from the written rendition, the written document will

20   control and will be incorporated into the judgment and

21   commitment order.

22          Let me ask first, Mr. Wright, do you understand and

23   accept the terms and conditions of supervised release, sir?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  All right.  Let me also advise you of

1   your appellate rights.  So you do have the right to file an

2   appeal, and you can appeal consistent with the appellate rights

3   that you have reserved in your plea agreement.  To the extent

4   that you do wish to file an appeal, you need to file a notice

5   of appeal within 14 days of the judgment.  Assume it's going to

6   happen today that I'll enter the judgment.  You need to specify

7   the judgment and/or order that you're appealing from with a

8   sufficient level of specificity.  If you don't have the ability

9   to pay -- I don't think this applies to you, but if you don't

10  have the ability to pay, apply for a -- for permission to waive

11  the fees and the costs of a transcript to prosecute the appeal.

12          Do you understand the appellate rights as I have

13  just now described them?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  So let's talk about a couple of matters.

16  First of all, with regard to surrender, how much time is he

17  requesting for surrender?

18          MR. PACHECO:  60 days, your Honor.

19          THE COURT:  All right.  Any objection to the 60-day

20  request?

21          MS. MILLS:  No objection, your Honor.

22          THE COURT:  The Court finds clear and convincing

23  evidence that the defendant does not in any way present a

24  threat to public safety or a flight risk, so I am going to

25  permit a 60-day surrender.  And this will be on June 24th by

1  noon.  And this will be to the U.S. Marshal.  And I am going to

2  follow the Probation recommendation that you surrender at the

3  Roybal building, to the Marshal Service, by noon.

4          With regard to the payment of the fine, let me hear

5  about his ability to pay, Counsel.  I have, as I've said,

6  reviewed the pre-sentence report and its statement about his

7  financial condition.  It does appear to the Court from at least

8  the on-hand cash that he has that he would be in a position to

9  pay the $30,000, or the 35,000, whatever the recommendation was

10 by Probation, within the 30-day period.  It's not clear to me

11 that he would have that ability with regard to the increased

12 amount that the Court has ordered, the $75,000 amount.

13         MR. PACHECO:  Your Honor, I think the time frames

14 that the Court discussed would work if it was the initial

15 payment within the 30 days and then within another 30 days the

16 completed payment, the remaining 45.

17         THE COURT:  All right.  And that includes the

18 mandatory special assessment?

19         MR. PACHECO:  Yes.

20         THE COURT:  All right.  So this is what the Court

21 will order, is that Mr. Wright is to pay $35,000, that is,

22 $35,100, within 30 days, and then he's to pay the remaining

23 balance, which would be the $40,000, by June 24th, which is the

24 60-day period.  That is the request, Counsel?

25         MR. PACHECO:  It is, your Honor.

1          THE COURT:  And that's what the commitment order

2    will indicate.  And is there any special request with regard to

3    any recommendations?

4          MR. PACHECO:  Yes, your Honor.  We would -- we have

5    a couple of requested recommendations.  One would be a

6    designation to Lompoc, the camp there, your Honor, and also a

7    recommendation for the RDAP program, your Honor.  And then

8    also, your Honor, lastly, on the self-surrender, if we can, if

9    the Bureau of Prisons determines a designation, we'd like him

10   to surrender to the -- either to, as the Court has said, to

11   Roybal, the Marshal Service there, or to the facility if the

12   Bureau of Prisons has designated by that time frame.

13          THE COURT:  Very well.

14          Does the Government wish to be heard on any of the

15   requests?

16          MS. MILLS:  No, your Honor.  Thank you.

17          THE COURT:  I am going to make the recommendations

18   as requested.  So, first of all, the Court is recommending the

19   RDAP program.  And I appreciate the request in that regard.  I

20   know the Probation Department, I don't believe, has

21   requested -- maybe I'm misremembering.  I know that they had

22   suggested the mental health evaluation, but I think

23   particularly with the alcohol, what I read gives the Court some

24   concern.  And I think that is the only issue that I saw of

25   concern in that regard.  So I will make the recommendation of

1  the RDAP program.

2          Also, I am going to recommend Lompoc.  If not

3  Lompoc, I assume the secondary or ancillary request is local --

4  as local housing as possible if Lompoc is not in the cards; is

5  that correct?

6          MR. PACHECO:  Yes, your Honor.

7          THE COURT:  And I think that would be particularly

8  useful in light of the tremendous family and friend support,

9  which I certainly expect and hope will continue to see

10 Mr. Wright through what will be undoubtedly a difficult time.

11         With regard to the request of surrendering to the

12 designated facility, the Court will permit that, provided that

13 the Bureau of Prisons or the Probation Department concur in

14 that.  So what I'd like you to do, Counsel, is just to make

15 sure that you've gotten some response from either Probation or

16 the Bureau of Prisons that his surrender to that location is

17 acceptable to them.  It is clearly acceptable to the Court.

18 The reason I say that is I am not familiar with this particular

19 bureaucracy to know whether that potentially could cause a

20 problem, and I'm trying to avoid the problem at the outset.

21         All right.  Is there anything further for the

22 Government before we conclude this matter?

23         MS. MILLS:  No, your Honor.  Thank you.

24         THE COURT:  Anything further from the defense?

25         MR. PACHECO:  No, your Honor.  Thank you.

 1          THE COURT:  Then this matter is concluded.  And,

 2   Mr. Wright, I do wish you, your family, and your friends all

 3   the best, sir.  We're in recess.

 4          (Proceedings concluded at 2:52 p.m.)

 5

 6          CERTIFICATE OF OFFICIAL REPORTER

 7

 8   COUNTY OF LOS ANGELES    )
                             )
 9   STATE OF CALIFORNIA     )

10

11          I, JUDY K. MOORE, FEDERAL OFFICIAL REALTIME COURT

12   REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

13   CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

14   TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

15   IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

16   REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

17   THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

18   REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

19

20

21          DATED THIS 9TH DAY OF MAY, 2022.

22

23

                  /s/Judy K. Moore
24          _____
                  JUDY K. MOORE, CRR, RMR
25          FEDERAL OFFICIAL COURT REPORTER